McVICKER v. AMERICAN OPERA Co., (NATIONAL OPERA Co., Intervenor.)[1]

*(Circuit Court, N. D. Illinois. December 5, 1889.)*

CORPORATIONS—INSOLVENCY—RIGHTS OF CREDITORS.
   Where an insolvent corporation reorganizes under a new charter and a different name, its property is still liable for its debts, though transferred to the new corporation for a valuable consideration.

At Law.
*Condee & Rose,* for plaintiff.
*Isham, Lincoln & Beale,* for defendant.

GRESHAM, J. On August 5, 1886, James H. McVicker commenced his action in *assumpsit* against the American Opera Company for breach of its contract for the use of his theater. On September 8, 1886, at a meeting of the directors of the American Opera Company, the question of forming a National Opera Company was discussed, and the following preamble and resolutions were unanimously adopted:

"Whereas, for the purpose of promoting a higher musical education in the United States, it is desirable that the principal cities should co-operate upon a uniform and equitable plan for establishing a national opera, Resolved that a National Opera Company be formed, in which each city having a local American Opera Company shall be represented by directors in proportion to its capital, and have proportionate ownership and voice in its direction; Resolved that the present American Opera Company, Limited, will co-operate in this movement by appropriate reorganization, transferring its property to the National Company: and Resolved that a local company be formed for New York city on the same basis in the National Company as the local American Opera Companies in all the other cities."

In pursuance of these resolutions, the National Opera Company was organized, under the laws of New Jersey, with a capital stock of $500,-000, and a certificate of organization was filed in the office of the secretary of state on November 26, 1886. At a meeting of stockholders of the American Company on November 29, 1886, two contracts, which had been approved at a meeting of the directors on the 22d, were submitted. One of these contracts provided for a lease of the entire property of the American Company to the National Company for one year for $25,000, and the other provided for the sale of the same property to the National Company, at any time within one year, for $375,000, namely, the $25,000 already referred to as rental, and $350,000, to be paid, either in cash, or the stock of the National Company at its par value. On the last-named day, namely, November 29th, at a meeting of the directors of the National Company, a resolution was adopted approving of the proposed agreements, and authorizing and directing the executive committee to pay the $25,000 under the lease, and take possession of the property. The lease was accordingly executed by the offi-

[1]Reported by Louis Boisot, Jr., of the Chicago bar.

cers of the respective companies on the same day, and on the following day the optional agreement was also executed. All the costumes, scenery, and other property of the American was embraced in the lease, and the National undertook to perform all the contracts of the American, and for that purpose continued in its service the employes, singers, artists, etc., of the American. The capital stock of the American was $250,000, and with a few exceptions its stockholders and officers became stockholders and officers of the National. On December 7, 1886, the general manager of the American Company was at Chicago, with its property, to give an opera, and two days later the lease was presented to him, and he was requested to furnish an inventory of the property embraced in it, and stencil on the same, or the packages containing it, the name of the National Company. Up to this time Gottschalk had been the custodian of the property of the American Company, and he was now employed to serve in the same capacity for the National. The $25,000 rental was paid at Chicago at or about this time. On December 13, 1886, McVicker sued out an attachment in aid of his then pending suit, and the writ was levied on part of the property embraced in the lease, and on the next day he commenced a second suit for breach of another similar contract, and sued out an attachment in aid of that suit, which, on the same day, was levied on other property embraced in the lease. On December 14th the National Company fully exercised its option to purchase the property, and notified the American Company of that fact, and delivered to it $350,000 of the stock of the National.

The American Company was insolvent when the resolutions were adopted on September 7th, and the evidence shows that it remained so until March following, when, in a suit brought against it in New York, a receiver was appointed. It transacted no business after the National Company was organized, which also became insolvent, and in a suit commenced against it in New York in the fall of 1887 a receiver was appointed. Instead of holding its assets as a fund for the payment of creditors, it being insolvent, the American Company caused the National Company to be organized for the purpose of transferring to it all of the former's property. Indeed, the resolutions adopted on September 7th contemplated a reorganization of the American Company under another name, without essential change in object or purpose, which was done, and the business proceeded just as before.

The language of the resolutions adopted on September 7th leaves no room for doubt as to what was contemplated by the directors of the American Company. By the second resolution it was declared that the company "will co-operate in the movement by appropriate reorganization, and transfer of its property to the National Opera Company;" and by the third resolution it was declared "that a local company be formed for New York city, to be on the same basis in the National Company as the local opera companies in all the other cities." The new company, when organized, was expected to take the place of the insolvent American Company, and succeed to all of its rights, and the latter become defunct. If it was contemplated that the American Company should con-

tinue in business as a local company in the city of New York, in co-operation with the new company, why provide in the third resolution for the organization of another local company for the same place? The evidence clearly shows that after the reorganization of the new company, the American transacted no business. An insolvent corporation cannot thus reorganize, and hold its property against creditors. Even if this scheme was not intended to hinder or delay McVicker in the prosecution of his suit and the collection of his debt,—and I do not hold that it was,—it had that effect, and the law presumes that the necessary consequences of an act are intended. On the theory that the American Company and the National Company were distinct legal entities, the latter was not ignorant of the condition of the former. By the lease, the American Company disposed of all its property for 12 months; and, whether the $25,000 was a fair rental or not, the insolvent lessor could not thus place its property beyond the reach of creditors. Instead of holding its assets in trust for creditors, as it should have done, it being insolvent, the American Company endeavored to place them where the creditors, for a time at least, could not so readily reach them. The first attachment appears to have been levied before the sale was consummated under the optional agreement; but, however that may be, the property was properly seized under both writs. Findings have already been announced of the amount due McVicker for breach of the two contracts.