SHADFORD *v.* DETROIT. YPSILANTI & ANN ARBOR RAIL-
WAY.

1. STREET RAILWAYS—CONSOLIDATION.

   A street-railway company formed by the consolidation of
   other street-railway companies cannot, when sued upon a
   judgment obtained against one of the consolidating com-
   panies, maintain that the consolidation was illegal and void
   because not authorized by the street-railway statute.

2. SAME—LIABILITY FOR DEBTS OF OLD COMPANIES.

   The organization of a street-railway company for the sole pur-
   pose of absorbing all the business and property of other
   street-railway companies, brought about by the issue of stock
   and bonds in the new company to the stockholders and bond-
   holders of the old companies to replace their stock and bonds,
   which are surrendered and canceled, and without the pay-
   ment of any consideration to the old companies for the trans-
   fer of their property, constitutes a consolidation, and not a
   sale, and makes the new company liable for the debts of the
   old companies.[1]

3. SAME—INSOLVENCY OF OLD COMPANIES.

   By a consolidation of two street-railway companies, the new
   company is burdened with the debts of the old companies,
   and cannot escape liability on the ground that the old com-
   panies were insolvent, and that the creditors have not been
   prejudiced by the consolidation.

Error to Washtenaw; Kinne, J. Submitted February
18, 1902. (Docket No. 19.) Decided April 8, 1902.

*Assumpsit* by John Shadford against the Detroit,
Ypsilanti & Ann Arbor Railway to recover the amount
of a judgment against the Ann Arbor Street-Railway
Company. From a judgment for plaintiff on verdict
directed by the court, defendant brings error. Affirmed.

---

[1] As to liability of consolidated railroad companies for debts of
their predecessors, see note to *Chicago, etc., R. Co.* v. *Hall,* (Ind.)
23 L. R. A. 231.

The Ann Arbor Street-Railway Company was incorporated in August, 1888, to operate a street railway exclusively in the city of Ann Arbor. Its capital stock was $100,000, and soon after its organization it gave a mortgage for $60,000, to secure that amount of bonds, which were sold. The road was built and put in operation. It was not a financial success. January 23, 1893, its barns and some of its rolling stock were burned. It collected an insurance of $10,000, with which it paid one of its debts. The bondholders took possession of the property. It appears to have been reorganized, and its tracks increased. The reorganized company replaced the old mortgage by another for $100,000. In September, 1894, one of its employés, engaged in the work of the extension of the road, was injured, brought suit against the company, recovered a judgment, issued an execution, and levied upon all the property of the company. That judgment was reversed by this court January 5, 1897, and a new trial ordered. *Shadford* v. *Ann Arbor St. R. Co.*, 111 Mich. 390 (69 N. W. 661). On December 17, 1897, he obtained another judgment against the company, upon which he issued execution, which was returned *nulla bona.* That case was affirmed in this court September 19, 1899. 121 Mich. 224 (80 N. W. 30).

The Ann Arbor & Ypsilanti Street-Railway Company was organized in 1890, to operate a street railway between the cities of Ypsilanti and Ann Arbor, its western terminus being at the eastern boundary of the city of Ann Arbor. It was operated by steam. Its stock was $100,000; its bonded indebtedness $60,000, secured by a trust mortgage.

On July 31, 1896, the Ann Arbor & Ypsilanti Electric Railway Company was organized, with a capital stock of $100,000. In August following, the Ann Arbor & Ypsilanti Street-Railway Company conveyed, by deed and bill of sale, all its property, real and personal, to the Ann Arbor & Ypsilanti Electric Railway Company. This conveyance or transfer was effected in the following manner:

All the stockholders of the Ann Arbor & Ypsilanti Street-Railway Company conveyed their stock to the electric company, and the bondholders of the former company also transferred their bonds to the electric company. In compensation for such transfer, the electric company issued to each stockholder of the Ann Arbor & Ypsilanti Street-Railway Company one-half share of the stock in the electric company for each share of stock of the former company; and for each bond in the Ann Arbor & Ypsilanti Street-Railway Company it issued a bond in the electric company. In September following, the Ann Arbor Street-Railway Company also conveyed its property to the Ann Arbor & Ypsilanti Electric Railway Company, and the sole consideration paid for this transfer was the issue of one-half a share in the new company for each share held in the Ann Arbor Company, and the issue of half a bond in the new company for each bond in the Ann Arbor road. The bonds in the Ann Arbor and also of the Ann Arbor & Ypsilanti roads were surrendered and canceled, and the Ann Arbor & Ypsilanti Electric Railway Company issued bonds to the amount of $150,000, $110,000 of which were issued to the bondholders of the other two roads. $8,000 more of the bonds were sold to equip the line between Ann Arbor & Ypsilanti (formerly operated by steam) with electric power. The claim of plaintiff and the judgment obtained by him were known to all the parties interested in organizing the electric company, and a bond of indemnity was executed to the electric company against this claim.

In November, 1897, defendant was organized, and negotiations promptly opened between that company and the Ann Arbor & Ypsilanti Electric Railway Company for either a purchase of, or a consolidation with, that new company. An agreement was soon reached, and was substantially the same as that between the three companies above mentioned. The entire stock and bonds of the electric company were transferred to the defendant, and in lieu thereof the defendant issued to each stockholder of

the electric company one share of stock in the defendant for each share in the electric company, and a bond and a half of the defendant company for each bond of the electric company. Many of the stockholders of the electric company were also holders of its bonds. A syndicate of the stockholders of the electric company made a written agreement with the defendant on December 30, 1897, embodying the above arrangements, and providing for the construction of the road by the defendant from Detroit to connect with the tracks of the electric road at Ypsilanti on or before May 15, 1898. A meeting of the stockholders was called on January 3, 1898, for the purpose of carrying out this agreement. What proportion of the stockholders was present I do not find that the record shows, but the following resolution was unanimously adopted:

" *Whereas*, the stockholders of the Ann Arbor & Ypsilanti Electric Railway Company, owning more than a majority of the capital stock, have entered into certain contracts for the sale of the shares of stock owned by them and each of them to the Detroit, Ypsilanti & Ann Arbor Railway, a corporation organized and existing under the street-railway laws of the State of Michigan, which is building and proposes to finish its street-railway from the terminus of the track of the Ann Arbor & Ypsilanti Street Railway, in the city of Ypsilanti, Michigan, to the city of Detroit, Michigan, at prices and of certain consideration in said contracts specified:

" Now, therefore, be it resolved that the board of directors be hereby authorized to sell the whole property, real, personal, and mixed, rights, franchises, and other property of this Ann Arbor & Ypsilanti Electric Railway Company, and to call in all the stock of this corporation, and pay, or cause to be paid, each holder the price such holder is entitled to receive for his stock according to the terms of the contract of sale of said stock to said Detroit, Ypsilanti & Ann Arbor Railway referred to; and the holders of the stock of this corporation who shall neglect or refuse to make contracts of sale with said Detroit, Ypsilanti & Ann Arbor Railway, within ten days from the date hereof, shall receive a *pro rata* share according to the number of shares held by them and each of them, at the following price, to be paid by the Detroit, Ypsilanti & Ann Arbor

Railway, to wit, amounts for the consideration equal to the price to be received by the other stockholders."

The arrangement was carried out, and on May 11, 1898, a deed of its real estate and a bill of sale of all its personal property were duly executed by the electric company to the defendant company. The defendant assumed an indebtedness of $16,000 of the electric company, and received from it $32,000 of its bonds, which had been pledged as collateral to that debt. The bond of indemnity which had been executed to the electric company to indemnify it against plaintiff's claim was transferred to the defendant.

Plaintiff insists that there was a consolidation (1) between the Ann Arbor Street-Railway Company, the Ann Arbor & Ypsilanti Street-Railway Company, and the Ann Arbor & Ypsilanti Electric Railway Company; and (2) between the Ann Arbor & Ypsilanti Electric Railway Company and the defendant; while the defendant insists that in each case it was not a consolidation, but a purchase.

The circuit court directed a verdict for the plaintiff.

*Lawrence & Butterfield*, for appellant.

*A. J. Sawyer & Son*, for appellee.

GRANT, J. (*after stating the facts*). 1. The defendant and the several other organized companies involved in this controversy were organized under the tram or street railway acts, and not under the railroad law of the State. It is urged that the acts under which these companies were organized do not authorize a consolidation, and that, therefore, any attempted consolidation would be illegal and void. In this case the conclusive reply to this proposition is that the defendant is not in position to raise the question. If there was in fact a consolidation between the Ann Arbor Street-Railway Company and the Ann Arbor & Ypsilanti Street-Railway Company and the Ann Arbor & Ypsilanti Electric Railway Company, and between the last company and the defendant, the latter cannot deny its liabilities, either for contracts or torts, or its

liability resulting from such consolidation, upon the plea that its organization is 'illegal. The legality of its organization cannot be attacked collaterally in suits by and against it, based upon dealings with it. Its legality can be attacked only in a direct proceeding by the State for that purpose. So long as the State chooses to recognize its validity by keeping silence, it is a corporation *de facto*, though not *de jure*, and liable the same as any other corporation in its dealings with others. *Swartwout* v. *Railroad Co.*, 24 Mich. 389, and note; *Hall Manfg. Co.* v. *Railway Supply Co.*, 48 Mich. 331 (12 N. W. 205); *Coe* v. *Railway Co.*, 31 N. J. Eq. 105; *Washburn* v. *County of Cass*, 3 Dill. 251 (Fed. Cas. No. 17,213); *Tarpey* v. *Salt Co.*, 5 Utah, 494 (17 Pac. 631); *Bell* v. *Railroad Co.*, (N. J. Ch.) 10 Atl. 741, and note; *Whitney* v. *Wyman*, 101 U. S. 392.

2. Did the transactions between these companies constitute consolidations or sales ? It is manifest that the Ann Arbor & Ypsilanti Electric Railway Company was organized for the purpose of uniting the two old organizations under one management, or of absorbing them, and taking over to itself all their properties and business. It exercised no other function, and evidently it was not the intention to construct a new road between Ypsilanti and Ann Arbor. It did nothing but to absorb these roads and run them as one. The stockholders, managers, and directors of the old companies were the parties who created and organized the electric company, and who transferred all the stock to the new company. The directors of the two old companies all became stockholders in the new, and most of them as well bondholders. The electric company paid not a dollar to the other companies as compensation for the transfers of all their properties to it. The arrangement left the two old companies without assets and without business. They were virtually out of existence by the arrangement. They had not only disposed of all their property, but all the business which they were organized to do. Under defendant's contention, their creditors had no remedy except by

suit in equity to compel the stockholders to pay assessments to the full value of their stock, or to reach the stock and bonds of the electric company which had been received by the stockholders of the old companies, upon the theory that they were assets of those companies. If the stock was fully paid, such proceedings would be valueless. Whether the stock in the electric company, in the hands of the stockholders who had been stockholders in the Ann Arbor Company, could be reached by a proceeding in equity, is a doubtful question, but it is unnecessary to discuss it. We think that the law will not permit such a transaction upon the theory of a sale. Those who managed the transaction evidently thought so too; otherwise they would not have taken the precaution to take a bond from the Ann Arbor Street-Railway Company to indemnify the electric company against the plaintiff's claim. Every layman knows that by the purchase of property the vendee does not assume the vendor's debts, and that this rule applies as well to corporations as to individuals. Mr. Beach says:

"The word 'consolidation' is used to denote any conjunction or union of the stock, property, or franchises of two or more corporations, whereby the conduct of their affairs is permanently, or for a long period of time, placed under one management, whether the agreement between them be by lease, sale, or other form of contract, and whether its effect be the dissolution of neither of the companies, or whether one of them be dissolved and its existence be merged in the corporate being of the other, or whether it result in the dissolution of both companies, and the creation of a new corporation out of such portions of the original companies as enter into the new." 1 Beach, Priv. Corp. § 326.

We are of the opinion that each transaction was a consolidation in fact, or, as it is termed in England, an "amalgamation." The law will not permit the creditors of two corporations to be deprived of the assets of such corporations in payment of their debts, and turn them over to suits in equity against the stockholders, when the union or consolidation with another corporation is effected with-

out the passage of a dollar or other valuable consideration between the corporations themselves. The effect here is precisely the same as though the stockholders of the Ann Arbor Street-Railway Company and of the Ann Arbor & Ypsilanti Street-Railway Company had united to form the electric company, and had pooled their stock and bonds into the one company. The purpose and result of both proceedings would have been the same. *Chicago, etc., R. Co.* v. *Ashling,* 56 Ill. App. 327; *Hurd* v. *Steam Laundry Co.,* (Sup.) 60 N. W. Supp. 813. Not a dollar was paid, in either of these consolidations, into the treasury of those companies whose existence was thereby terminated. What we said in *Grenell* v. *Gas Co.,* 112 Mich. 70 (70 N. W. 413), is equally applicable here:

> "A corporation cannot sell all of its property, and take in payment stock in a new corporation, under an arrangement that has the effect of distributing the assets of the vendor among its stockholders, to the exclusion and prejudice of its creditors."

Even if this were a purchase, it was a purchase under similar circumstances to those in the *Grenell Case,* wherein we held that the purchase was subject to the rights of creditors.

3. It is also contended that the Ann Arbor Street-Railway Company was insolvent, and that therefore plaintiff was not prejudiced by the consolidation or transfer. The consolidated company cannot raise this question. The question is not whether either of the old companies was solvent or insolvent, or whether both were solvent or insolvent. By the consolidation the new company is burdened with the debts of the old, and the sole question then is, Has the new company sufficient assets to pay its debts, which then include those of the old companies?

The judgment is affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. LONG, J., did not sit.