DROVERS' & MECHANICS' NAT. BANK OF BALTIMORE, MD., v. FIRST
NAT. BANK OF SUTTON, W. VA., et al.

(Circuit Court of Appeals, Fourth Circuit.  July 1, 1919.)

No. 1705.

1. BANKS AND BANKING ⬤⟲117—BANK NOT LIABLE ON INDORSEMENT BY VICE
PRESIDENT OF HIS NOTE IN BANK'S NAME.
    A bank *held* not liable on an indorsement by its vice president in its
name of his individual note to it, delivered to another bank to take up a
prior note made by him before his connection with the indorsing bank, and
accepted on his false representation, unverified, that the bank had assumed
liability for the prior note, under circumstances which should have put
the receiving bank on inquiry.

2. BANKS AND BANKING ⬤⟲67—PURCHASE OF ASSETS OF ANOTHER BANK DOES
NOT RENDER PURCHASER LIABLE FOR DEBTS OF SELLING BANK.
    A purchase by definite contract by one banking corporation of the
assets of another and the assumption of debts specified in the contract
does not constitute a merger or consolidation, and does not, in the absence
of fraud, make the purchasing corporation liable for all the debts of the
selling corporation.

3. BANKS AND BANKING ⬤⟲111—BANK NOT BOUND BY FALSE REPRESENTA-
TIONS BY OFFICER OF MERGER WITH ANOTHER BANK.
    Merger of a banking corporation with another and assumption by it
of the entire debts of the other is not in the usual course of business of
such corporations, and a bank is not bound by the false statement of a
vice president or other officer in charge of its current business that there
has been such merger and assumption of liabilities.

In Error to the District Court of the United States for the South-
ern District of West Virginia, at Charleston; Benjamin F. Keller,
Judge.

Action at law by the Drovers' & Mechanics' National Bank of Bal-
timore, Md., against the First National Bank of Sutton, W. Va.,
and P. E. Wagner, its receiver.  Judgment for defendants, and plain-
tiff brings error.  Affirmed.

Carlyle Barton and Alfred S. Niles, both of Baltimore, Md. (Niles,
Wolff, Barton & Morrow, of Baltimore, Md., on the brief), for
plaintiff in error.

Connor Hall and D. C. T. Davis, Jr., both of Charleston, W. Va.
(Davis, Davis & Hall, of Charleston, W. Va., on the brief), for de-
fendants in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge.  On the first trial the District Judge, try-
ing the case by consent without a jury, found in favor of the plain-
tiff.  This court held that he should have found for the defendant.
244 Fed. 135, 156 C. C. A. 563.  On the second trial the record of
the testimony in the first trial was received by consent, and some addi-
tional testimony was offered.  The District Court found in favor of

the defendant, and the question now is whether the new evidence, taken in connection with that offered at the first trial, should change the conclusion reached by this court in its former judgment. For the sake of clearness we restate the entire case, so that the effect of the new evidence may be considered in sequence.

In January, 1914, H. H. Dean became vice president of the First National Bank of Sutton, W. Va. In fraud of the bank and for his own benefit he made his own note for $15,000, payable to the bank, or order, three months after date, and indorsed it in the name of the bank to the Drovers' & Mechanics' National Bank of Baltimore. The issue in this action brought by the Baltimore bank is whether the First National Bank is liable as indorser, notwithstanding Dean's fraud.

[1] The surrounding details are somewhat complex, but the decision depends on the application of the law to leading facts not in serious dispute. Prior to the year 1914 Dean had no connection with the First National Bank, but was treasurer of the Farmers' Bank & Trust Company of Sutton, W. Va. On or about December 24, 1913, as treasurer, he applied to the Drovers' & Mechanics' National Bank of Baltimore for a loan to the trust company of $15,000. The Baltimore bank required a resolution of the board of directors authorizing the loan. In response, Dean sent a copy of a resolution authorizing the borrowing of $30,000, bearing on its face the date December 29, 1913. This was in reality a resolution signed by the president and vice president in 1911, Dean altering the date to suit his purposes. The Baltimore bank agreed to make the loan, and discounted a note for $15,000, signed by Dean individually, and indorsed by him in the name of the trust company, taking as collateral a note for $22,000 of J. V. Thompson and J. R. Barnes, payable to S. W. Shrader, and indorsed by Shrader, Showalter, and Dean, and by Dean in the name of the trust company. The Baltimore bank, after applying $6,000 of the proceeds to a note of the trust company for that amount, credited the trust company with the balance and paid it out in due course on checks of the trust company. That this transaction was really a discount of his own note by Dean for his own benefit was shown by a credit made by Dean on the trust company's books to himself of the net proceeds of the note, $14,775, at the same time that he made a charge for that amount in the trust company's books to the Baltimore bank.

The collateral Thompson note, with its indorsements, was as follows:

"$22,100.00.                                    Uniontown, Pa., Oct. 15, 1913.
"One year after date we promise to pay to the order of S. W. Shrader twenty-two thousand one hundred dollars at the First National Bank, Uniontown, value received, without defalcation, from date at six per centum per annum payable annually.
"No. ———. Due ———.                                    J. V. Thompson.
                                                              "J. R. Barnes."
· Indorsed: "S. W. Shrader. Howard M. Showalter. H. H. Dean. Pay to the order of any bank, banker or trust company. Farmers' Bank & Trust Co., Sutton, W. Va., H. H. Dean, Treasurer."

On January 15, 1914, a contract was made between the trust company and the First National Bank, which was manifestly intended as a sale and transfer of the chief assets and active business of the trust company to the First National Bank. By this contract the trust company turned over to the First National Bank cash, notes, and other assets to the amount of $198,506.31. The First National Bank assumed liability for the trust company's deposits, balances due to other banks, and certain notes to other banks to the amount of $203,970.32. For the difference, $5,464.01, between the liabilities assumed and the assets turned over, the trust company gave its note to the First National Bank. The liabilities of the trust company assumed were carefully specified. The $15,000 note indorsed by the trust company to the Baltimore bank, not having been entered by Dean on the books of the trust company, was not known, and was not assumed nor mentioned. The evidence requires the inference, also, that the Thompson note for $22,000, indorsed by Dean in the name of the trust company as collateral for the $15,000 note, never appeared on the books of the trust company as an asset, and was not embraced in the notes assigned to the First National Bank. As the First National Bank never assumed the payment of the $15,000 note, and never received any benefit of that note in its contract with the trust company, this action has no support, if it depends on the contract.

After the execution of the contract between the two banks Dean became vice president of the First National Bank, and the management of the business was left mainly, if not entirely, in the hands of the vice president and his inferior officer, Casto, the cashier. Before maturity of the $15,000 note of Dean, indorsed by the trust company, Dean agreed on demand of the Baltimore bank to procure a resolution of the directors of the First National Bank authorizing the payment of the note by substitution of a new note of Dean, indorsed by the First National Bank. Dean, on March 24, 1914, wrote the Baltimore bank that a merger had taken place, and sent forward the new note signed by him individually and indorsed by him in the name of the First National Bank, with a pretended copy of a fictitious resolution of the board of directors of that bank, signed by him as secretary, and certified by him as vice president, not authorizing the assumption of a debt of the trust company, but negotiation of a loan of $15,000. Relying upon this resolution, the Baltimore bank marked the old note paid and returned it, taking in its place the new note, which Dean had undertaken to indorse in the name of the First National Bank, but retained the Thompson note as collateral. This transaction was handled through the note teller's department and did not appear in statements of account made in due course to the First National Bank. A check for $225 on a New York bank was drawn by Dean as vice president in favor of Dean as an individual, and by him indorsed in payment of the discount. On maturity of this note on June 22, 1914, it was renewed in like form, and again the transaction appeared only on the discount ledger. The discount, $225, was paid by a check on the Baltimore bank, drawn by

Dean as vice president in his favor as an individual, and indorsed by him. This check was charged in the account of the First National Bank with the Baltimore bank, and no objection was made to it. But the check indicates that Dean paid for it, and there is nothing in the record tending to show that he did not.

From this statement it will be observed that the First National Bank had nothing to do with the making of the debt which is the foundation of the note in suit; that it received no part of the consideration; that neither in the contract with the trust company nor in any other way did it assume the payment of the note; that Dean in all the transactions concerning it was acting in his own interest, and in fraud, first of the trust company, and then of the First National Bank.

Nevertheless, since Dean was intrusted with the general transaction of the business as vice president of the First National Bank, he had authority to borrow money and bind the bank therefor, by making or indorsing notes in its name and assigning its bills receivable as security in the usual course of business, and to bind the bank in any other matter which in due course of business fell under the authority of an executive officer of a bank. Auten v. United States National Bank, 174 U. S. 125, 19 Sup. Ct. 628, 43 L. Ed. 920; Aldrich v. Chemical National Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611.

But, on the other hand, if the transactions here under review were so out of the usual course of business as to put the Baltimore bank on notice that Dean was acting beyond his authority, or using the bank's name and credit in his own interest, or that he was representing his own interest, or any antagonistic interest, then he stood before the Baltimore bank stripped of his representative capacity, and powerless to bind the First National Bank. West St. L. S. Bank v. Shawnee County Bank, 95 U. S. 557, 24 L. Ed. 490; Lamson v. Beard, 94 Fed. 30, 36 C. C. A. 56, 45 L. R. A. 822; 7 Corpus Juris, 541; Wagner v. Central Bk. & T. Co., 249 Fed. 145, 161 C. C. A. 197.

The scope of banking business is constantly enlarging, and the usual course of business becoming broader. The number and rapidity of banking transactions require banks to rely on the authority and good faith of the executive officer of correspondent banks. But, on the other hand, the stockholders and directors of banks, especially small banks, must rely on the honesty of their executive officers, and they have a right to demand that officers of other banks shall be reasonably diligent as capable business men to observe and act upon evidences that a president or cashier is acting beyond his authority, or for himself or some other person, while using the bank's name and credit. Taking the most liberal view in favor of the Baltimore bank, every transaction it had with Dean in relation to the $15,000 note was unusual; and all the transactions taken in connection carried notice of improper use of the bank's credit by Dean.

It has been held that a note of an officer to his own bank is presumed to be for value, and if nothing more appears it may be dis-

counted for the bank on its own indorsement without question by another bank. Hiawatha Iron Co. v. John Strange Paper Co., 106 Wis. 111, 81 N. W. 1034. But assuming, without deciding, that to be the law, it does not protect the Baltimore bank, for it accepted Dean's note payable to the trust company, his own bank, and indorsed by him in the name of the bank, on the representation that he was thus making himself the primary obligor for the debt of the bank as a mere accommodation to the bank, though the bank itself was to become secondarily liable only as an indorser.

It is contended that there was nothing unusual in such a transaction; that Mr. Owens, the vice president of the Baltimore bank, suggested or required this method merely to increase the security by having Dean's personal liability. It is true he does so testify in his direct examination; but he also testified that Dean became maker of the note "simply at the suggestion, I cannot recall now, possibly of ours, to add somewhat to the security of the note." But, whoever originated the plan, it could not have been adopted to obtain additional security by making Dean liable for the debt, for he was already liable as indorser of the Thompson note taken as collateral. Indeed, Dean's willingness to make himself primarily liable for a debt of the trust company ought to have arrested attention, in view of his already existing secondary liability as indorser of the Thompson note. What is more significant, the Thompson note on its face was notice to the Baltimore bank that Dean was an officer who was using the trust company to finance his own affairs; for his indorsement and that of the trust company indicated that Dean had been the owner of the Thompson note, and had indorsed it to the trust company and received the money for it. The use of this note so indorsed by him to draw money for himself from the trust company, as collateral to his own note for $15,000 to the trust company and indorsed by him for it, we cannot help thinking so clearly signified that he was mixing his own affairs with those of the trust company as to require at least inquiry of the directors or other officers of the trust company by the officers of the Baltimore bank before proceeding further.

Much stress is laid on the testimony of Mr. Owens, vice president of the Baltimore bank, and the new testimony of other bankers·that the transaction was in accordance with the usual course of business. While Mr. Owens' general statement to that effect is broad, he was candid enough to say that the transaction may not have been prudent, as it shows upon its face. The testimony of other bankers is guarded and limited to the statement that it would not be unusual to make a loan to a bank in the form of the note here involved, when there was no collateral, or the collateral given was of uncertain value. This testimony does not apply to this case (1) because there is no testimony that the Thompson note was not ample collateral; and (2) because the making of the note of $15,000 by Dean individually to the trust company and its indorsements to the Baltimore bank had no advantage over a direct note from the trust company to the Baltimore bank, since Dean was already liable as indorser of the Thompson note. Considering the transaction in all of its circumstances, we

think the conclusion inevitable that it was so out of the usual course that only the credulous would accept without inquiry Dean's false representation that the bank as indorser was to receive the entire benefit to the exclusion of himself as maker.

Next, when the note fell due, the Baltimore bank accepted Dean's untrue statement, without verification, that the trust company had been merged into the First National Bank, and inferred contrary to the fact, without a direct statement to that effect even from Dean, that in the merger the National Bank had assumed the note of Dean indorsed by the trust company. But the bank itself recognized that due care required it to have Dean's statements verified in a matter in which he was personally concerned, and required a resolution of the board of directors of the First National Bank as authority to protect it in renewal of Dean's note with the indorsement of the First National Bank substituted for that of the trust company. Indeed, the record shows that the banking custom—the usual course of business—adopted by the Baltimore bank was to require a resolution of the board of directors of the borrowing bank, duly certified, as a condition of lending money, and this makes a very marked distinction between this case and Auten v. United States National Bank, 174 U. S. 125, 19 Sup. Ct. 628, 43 L. Ed. 920.

In sending his own note, indorsed by him in the name of the First National Bank, to take up his old note, indorsed by the trust company, Dean wrote of his old note as "my note," and he inclosed a fictitious paper, in form a copy of a resolution of the board of directors of the First National Bank authorizing him as vice president to borrow $15,000 from the Baltimore bank. This pretended authority to borrow, even if it had been genuine, by no means conferred authority on Dean to assume for the bank the liability of Dean and the trust company, and thus it did not even in form meet the requirement which the Baltimore bank thought necessary to bind the First National Bank. But, aside from that, it was a forged resolution, and the Baltimore bank was content to accept as sufficient proof of its authenticity the pretensive certificate of Dean alone as vice president and as secretary of the board of directors. In addition to this, the check sent to the Baltimore bank for $225, the discount, was issued by Dean, as vice president, to Dean individually and indorsed by him. Indeed, in all of its dealings about a transaction in which Dean was personally liable and interested, not only as maker of the $15,000 note, but indorser of the collateral Thompson note, the bank accepted, without verification of any kind, Dean's own statements that liability for the note had been assumed by the First National Bank.

[2] It is contended, however, that the contract between the First National Bank and the trust company was in effect a merger or consolidation of the two banks, and that by operation of law the former corporation became liable for all the debts of the latter. In the opinion rendered when the case was here before, the contract was inadvertently referred to as intended to be a merger. But it was not. A purchase by definite contract by one corporation of the assets of

another, and the assumption of debts specified in the contract, does not constitute a merger or consolidation, and does not, in the absence of fraud, make the purchasing corporation liable for the debts of the selling corporation. In this instance there was no fraud in the purchase, every asset purchased and every debt assumed was particularly specified, the stock of the trust company was not purchased, no obligation was assumed to the stockholders of the selling corporation, and the trust company continued its business for the purpose of winding up its affairs, including the payment of the note given to the First National Bank. The contract, therefore, was not a merger or consolidation and by it the First National Bank did not become liable for any debt of the trust company not mentioned in the contract. E. E. Taenzer v. Chicago, R. I. & P. R. Co., 170 Fed. 240, 95 C. C. A. 436; Hoard v. Chesapeake & Ohio Ry., 123 U. S. 222, 8 Sup. Ct. 74, 31 L. Ed. 130; W. E. Austin Co. v. T. L. Smith Co., 138 Ga. 651, 75 S. E. 1048, Ann. Cas. 1913E, 1042, and note, 7 R. C. L. 180, § 156.

It is true that, in the advertisement of the change of business published by the First National Bank after its contract with the trust company, the change was referred to as a consolidation and merger. But that could not change the actual nature of the transaction, and it could not operate as an estoppel in favor of the Baltimore bank, because it did not act upon it. Indeed, no officer or agent of that bank even knew of the publication.

[3] Dean's untrue representation that there had been a merger and assumption by the First National Bank of the debts of the trust company, even if made in good faith, would not bind the First National Bank. There is no ground in reason or authority upon which it can be asserted that an officer of a bank may bind it for the debt of another bank on his mere false assertion that his bank has merged with another and assumed all its obligations. Merger of a corporation with another, and assumption by it of the entire debts of the other corporation, is not in the usual course of business of a corporation, and the corporation is not bound by the false statement of a vice president or other official in charge of its current business that there has been such a merger and assumption of liabilities. The Baltimore bank, therefore, cannot recover on the assertion that the First National Bank was bound by Dean's false representation that a merger had taken place, and the entire indebtedness of the trust company assumed. Merchants' Bank of Valdosta v. Baird, 160 Fed. 642, 90 C. C. A. 338, 17 L. R. A. (N. S.) 526, 3 R. C. L. 425, 7 C. J. 595.

Nor can the Baltimore bank avail itself of the fictitious resolution presented by Dean, because, even if it had been genuine, that only authorized the borrowing of money, and not the assumption of the debts of another bank. We conclude the Baltimore bank cannot recover against the First National Bank for these reasons:

(1) The First National Bank did not, by its contract with the trust company or otherwise, become liable for the debts of the trust company not expressly assumed.

(2) Dean had no authority as its managing officer to bind the First National Bank by his untrue representation that there had been a merger and consequent general assumption of the debts of the trust company.

(3) Dean had no authority as an officer of the First National Bank to assume for it, by accommodation indorsement or otherwise, the debt of himself and the trust company.

(4) Even if he had been clothed with the general authority to make such representation and indorsement, he appeared before the Baltimore bank representing three separate interests. As an individual maker of the note, and indorser of the Thompson note, he was interested that he should not be called on to pay this debt; as treasurer of the trust company he was interested in having the trust company relieved of the indorsement; and as vice president of the First National Bank his duty was to see that the First National Bank should not assume the liability of another without consideration. When these interests were evidently involved in antagonistic relations, the Baltimore bank cannot hold the First National Bank bound by Dean's attempt to assume for it a debt for which it held the obligation of other parties in interest, including Dean himself, whom he attempted to represent. True, the First National Bank, in the conduct of its general current business, held Dean out as its agent; but the implied authority fell from him as soon as his antagonistic interest appeared.

Affirmed.