FOSTORIA MILLING & GRAIN CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17191.   Promulgated May 15, 1928.

*Charles A. Guernsey, Esq.*, for the petitioner.
*Henry Ravenel, Esq.*, for the respondent.

## OPINION.

TRUSSELL: The petitioner herein, the Fostoria Milling & Grain Co., on January 12, 1924, purchased from the Fostoria Milling Co., all of its assets. This appeal is from a proposed assessment by the respondent, under section 280 of the Revenue Act of 1926, of the alleged liability on its part, as the transferee, for unpaid income and profits tax due from the transferor for the calendar year 1920, a deficiency in such taxes having been determined and asserted by respondent against the transferor 14 months subsequent to the sale of its assets to petitioner. There is accordingly no question involved of a statutory lien on a transferred property for the taxes in question.

The only question presented by the appeal is whether, under the facts proven, the petitioner is liable at law or in equity as transferee of the assets of the Fostoria Milling Co. for unpaid income and profits taxes of that company for the calendar year 1920. Petitioner does not question the determination of tax either in principle or amount as made by respondent against the taxpayer, but insists that it is a purchaser in good faith, for value, of the assets of the taxpayer, and as such has no liability at law or in equity for the latter's unpaid

debts and accordingly there can be no assessment against it under section 280 of the Revenue Act of 1926.

The section in question provides:

SEC. 280. (a) The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this title (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):

(1) The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this title or by any prior income, excess-profits, or war-profits tax Act.

By this section it will be noted that no new liability is created on the part of the transferee but merely a method of enforcement of such liability as is already his at law or in equity by reason of the circumstances under which he acquired the property of the taxpayer or by reason of any prior lien attaching to the property at the time of its acquirement.

Respondent insists that petitioner is no more than a reorganization and continuation of the taxpayer under a slightly altered name. In support of this he calls attention to the fact that of the 85 stockholders of the present corporation 80 were stockholders in the old corporation; that it is carrying on the same business and with the same physical assets. He further insists that even though it were not a continuation or successor of the old corporation it is still liable in equity under the trust-fund theory that the assets of a corporation are impressed with a trust in favor of creditors and if sold and transferred can be followed by a creditor whose claim is not satisfied.

Petitioner insists that it is not a reorganization of the taxpayer corporation but an entirely new, separate and distinct corporation, organized by 80 of the 361 stockholders of the taxpayer. It admits that it was organized for the purpose of purchasing the assets of the taxpayer and carrying on the business, but insists that its capital represents no interest of a stockholder in the former company but is new capital paid in by these certain stockholders of the former company as individuals and these amounts paid in do not represent assets of the old company distributed to stockholders, as there was no such distribution, as all stockholders in the old company lost their entire investment therein. It further insists that it purchased the assets of the old company for full value.

The record shows to our satisfaction that the Fostoria Milling Co., with a capitalization of $100,000, sustained in 1921 and 1922 losses in two ventures in very large amounts and found itself near the close

of the latter year insolvent, and unable to borrow funds to continue business. Its indebtedness to local banks amounted to $72,000 against which it had deposited collateral consisting of a similar amount of its bonds, secured by a first mortgage upon its property. Of this indebtedness $30,000 was additionally secured by personal indorsements of its directors. It was further indebted to several of its directors for $5,500 borrowed to pay current bills and in addition had various items of indebtedness such as unpaid salaries and taxes. The banks were pressing for payment and the business was at a standstill. Faced with this situation it can easily be seen that to avoid foreclosure and forced sale there were two courses open, either a reorganization by the stockholders or a voluntary sale of the property at a figure sufficient to meet existing indebtedness or at least one in excess of the sum which the property would likely bring at a forced sale. Efforts were made by the officers of the taxpayer to find a purchaser for the property. It was thought that the fair market price of the property was between $70,000 and $75,000 but no purchaser could be found at that figure and no offers were made for the property. It is testified by the former officers of the Fostoria Milling Co. that strenuous efforts to find a purchaser at a figure sufficient to pay the known indebtedness were made and this testimony can be readily believed when we consider that these men were individuals bound by indorsement on $30,000 of this indebtedness and were faced with a condition presenting a probability of loss not only of their total investment in the corporation but a much larger amount in addition.

The failure to find a purchaser willing to pay $70,000 for the property indicated that a forced sale under foreclosure would be at a very much lower figure and one much below the amount of known indebtedness and less than the bonded indebtedness.

The condition faced by the company and its directors was discussed by the latter with a Mr. Babbitt, a flour mill agent of Cleveland, Ohio, from whom for some years the company had made regular purchases of flour. Babbitt was not a stockholder of the company and had no interest in the matter other than to keep a good customer from whose account he had profited. This party conceived a plan of organizing a new company composed of the directors of the old company, who were faced with a large individual loss on their indorsements of the old company's paper, and such of its stockholders as could be induced to take stock together with what new parties they could interest, this company to purchase all of the assets of the old business for a consideration consisting of the assumption of the known indebtedness amounting to approximately $80,000.

In carrying out this arrangement, Babbitt, in his own name, made an offer to the Fostoria Milling Co. agreeing to assume and pay this indebtedness for a conveyance of all of its assets. This was accepted by the directors and submitted to and approved by the stockholders by a vote of 677 shares for and 134 against the proposal.

A new corporation, the petitioner herein, was then organized and the assets of the Fostoria Milling Co. were conveyed direct to it by direction of Babbitt, under an agreement made by it with the latter to accept them for a consideration consisting of the liability of Babbitt to pay indebtedness of the old company under his agreement with it, and also the payment to Babbitt of $500 cash and 900 shares of no par value common stock of the new company.

The new company was organized with an authorized capital stock of 1,500 shares preferred, of a par value of $100 each, and 2,500 shares of no par value common stock. Eighty out of a total of 361 of the stockholders of the old company and five individuals who had no interest in that company subscribed for $69,000 preferred stock of the new company, paying par for it.

The business of the old company was of a cooperative nature, serving a farming community, the farmers in that section having been its organizers and stockholders. It afforded a market for the grain produced in a comparatively small surrounding territory. That company was largely dependent on this business, the control of which was made possible by the personal interest of these producers in the business. For the same reason a new company organized to take over the business, to be successful, had to be local in character and number among its stockholders as many as possible of those with whom its daily business would be carried on. Unless it secured the personal interest of a considerable number of the local producers of grain its chance of successful operation would be doubtful in view of the fact that it had as a competitor in the same city one of the largest mills in the State. It thus became necessary to the new company to secure as stockholders as many of these local farmers as possible and those recognizing the necessity to the local farmer of maintaining a mill under their control were in large measure already stockholders of the old company.

Petitioner insists that there is no improper significance attached to the fact that of the 85 stockholders of the new company 80 had been stockholders in the old, but that this is due to the fact that the stock membership of the old company represented those to whose interest it was to maintain a local and cooperative business of this character and consequently they were necessarily the ones who wished to invest in the new company and whom the new company desired most to interest, and this desire on the part of each was

wholly aside from the fact that they had been stockholders in the old company.

The conditions testified to indicate strongly to us that the stock membership of the old company was composed of those parties whose individual interest was necessary to the successful operation of any new company which might be organized to carry on the business and consequently we can not consider the fact that 80 of the 85 stockholders in the new company were stockholders in the old as indicating that the former was a continuation or successor of the latter. The test of that is not identity of stock ownership in the two companies but whether or not some interest of the stockholders in the old is preserved to them in the new. It can not, in our opinion, be said that petitioner was a reorganization of the old company. There was no merger nor consolidation. *American Railway Express* v. *Commonwealth*, 190 Ky. 636, 228 S. W. 433; *Little Rock Chamber of Commerce* v. *Reliable Furniture Co.*, 138 Ark. 403, 211 S. W. 371. The organization of petitioner was distinct and separate. All of the issued preferred stock of petitioner was sold at par for cash or its equivalent, and the fact that persons interested in petitioner were also interested in the former company would not of itself render petitioner liable for its debts. *Anderson* v. *War Eagle Consol. Min. Co.*, 8 Idaho, 789, 72 Pac. 671; *Racine Eng. & Mch. Co.* v. *Confectioners Mch. Co.*, 234 Fed. 876.

Respondent calls attention to the fact that stockholders of the old company were given a bonus in common stock on preferred stock sold them in the new in excess of the bonus given purchasers who had not been stockholders in the old. We can not see that this alters the case as none of the stockholders in the old company were given any stock in the new, either common or preferred, because of such interest. In the organization of the latter no interest was given the stockholders of the old company as such. Such common stock as was given them by way of bonus was because of their new investment, and if of any value it was value represented by the new capital invested and not by the assets of the old company.

In view of the record we can not but view petitioner as a new and independent corporation and accordingly must consider whether the purchase of those assets by it was under such conditions as would impress those assets with a trust in favor of creditors whose claims were not satisfied. We can not find the slightest evidence in the record of bad faith on the part of the taxpayer or petitioner in connection with this transaction. There is no indication in this sale of assets of an intent to defraud or defeat the claims of creditors. The contrary is clearly shown by the fact that the sale provided specifically for the payment of every indebtedness then known to the taxpayer and that all of these debts were paid by the purchaser on taking the property.

Petitioner insists also that it paid the full value of the property and this assertion is supported by the record. The best evidence of the value of the property is the fact that with $72,000 of indebtedness the banks refused to make further loans and even required the personal indorsements of the directors on $30,000 of this amount although secured by a first mortgage on all the property of the taxpayer. At the hearing several of the former officers of the milling company testified to the efforts made to find a purchaser. They estimated the market value of the property to be between $70,000 and $75,000 and told of unsuccessful attempts made to find a purchaser at or between those figures. This testimony as to value is uncontradicted. We can not but conclude that a fair market value for the property was not in excess of $75,000 and the consideration actually paid by the purchaser under this sale was the equivalent of an amount in excess of $80,000 in the assumption and subsequent payment of debts, as the satisfaction of an antecedent debt is a consideration of the value of the debt satisfied. *Wareheim* v. *Bayliss* (Md.), 131 Atl. 27. *Atkinson* v. *Western Development Syndicate*, 170 Cal. 503; 150 Pac. 360; *Justice* v. *Catlettsburg Timber Co.*, 168 Ky. 665; 182 S. W. 831.

It is quite apparent that the consideration paid by petitioner was if anything in excess of the actual market value of the property and the payment of such a consideration was due in large measure to the fact that the directors of the taxpayer were thereby escaping a personal liability incurred through their indorsement of its paper. It can scarcely be thought that there was a lack of consideration for the sale when many of the stockholders assenting to it were thereby deprived of any chance of benefiting, as they were not interested in the purchasing corporation in any way, and when we consider the fact that this was a cooperative, neighborhood corporation and these stockholders were its customers, in daily contact with it, and in position to personally know its actual condition and fair value. Had the consideration been inadequate these stockholders would have suffered to that extent and we can not conceive of their approving the sale under those conditions with the knowledge which they must have possessed.

The question then to be determined is whether in a case of the purchase of all the assets of a corporation by another in good faith and for a consideration equivalent to their value, such assets are taken impressed with a trust in favor of creditors whose claims are not provided for.

In the case of *Wood* v. *Dummer*, 3 Mason, 308; 30 Fed. Cases 435, Justice Story originated the doctrine that the capital assets of a

corporation constituted a trust fund so far as corporate creditors were concerned and should be in equity so considered. This opinion was the authority for decisions by the courts in many cases in following years holding transfers by corporations of all of their assets void as against creditors. It finally became recognized, however, that the trust-fund theory as a distinct theory of legal responsibility in cases of sales of corporate assets was unsound as too broad, as there were many cases which must on their facts be excepted from its application, and consideration of these exceptions shows that these cases to which the rule could be applied were upon facts which would invalidate such sales, as to creditors, under the general rules applying to fraudulent conveyances by individuals.

The trust fund theory does not exist in England. It is purely an American doctrine. The fact is that the trust fund theory has beclouded rather than clarified the subject. For instance, on account of this theory some of the courts have fallen into error and hold that when a corporation is insolvent it cannot prefer one creditor as against another. The trust fund theory may well be superseded by the fact that the capital stock of a corporation is like the capital of a business man, and that just as he cannot, as against his creditors, give it away or forgive the debts of those who owe him, so the corporation cannot, as against its creditors, release subscriptions, give away its assets to stockholders by way of dividends, or buy its own stock with funds, which, upon insolvency, belong to its creditors instead of the stockholders. (Cook on Corporations, section 9.)

An examination of the decisions in cases where the transfer of the capital assets of corporations has been questioned by corporate creditors shows that these fall into three general classes, the first of these being those cases in which the assets of a corporation are sold for an equivalent consideration which, however, under an agreement is paid the stockholders, leaving the corporation without assets to satisfy its creditors. The courts have uniformly held the purchasing corporation liable to creditors of the selling corporation, to the extent of the value of the property received, the sale being in fraud of creditors and the purchaser being a party to such fraud through his knowledge that the result of the transaction must necessarily leave such creditors with no assets from which to satisfy their claims. *United States* v. *Capps Mfg. Co.*, 15 Fed. (2d) 528; *Grennell* v. *Detroit Gas Co.*, 112 Mich. 70, 70 N. W. 413; *McWilliams* v. *Excelsior Coal Co.*, 298 Fed. 884; *Swing* v. *American Glucose Co.*, 123 Ill. App. 156; *Chicago M. & St. P. Ry.* v. *Third National Bank*, 134 U. S. 276; *Vance* v. *McNabb Coal & Coke Co.*, 92 Tenn.. 47, 20 S. W. 424; *Berry* v. *Railroad Co.*, 52 Kans. 724; 36 Pac. 724; *Jennings, Neff & Co.* v. *Crystal Ice Co.*, 128 Tenn. 231, 159 S. W. 1088, 47 L. R. A. (N. S.) 1058. This rule has even been extended to cases where the consideration paid was stock of the purchasing corporation delivered to the seller, the court refusing to confine the creditors to the satisfaction of their claims out of the asset repre-

sented by this stock, on the ground that such a sale converted the assets from something which could easily be reached and impounded to one which could be easily transferred to defeat creditors and in many cases would necessitate their going into foreign jurisdiction to assert their claims. See *Hibernia Ins. Co.* v. *St. Louis & New Orleans Transportation Co.*, 13 Fed. 516.

The second general class of cases is that involving sales of all assets of a corporation in effecting a consolidation, merger or reorganization in which the rights and interests of the stockholders in an old corporation are represented in the new. In these cases the courts hold the new corporation liable to creditors of the old upon the ground that by the arrangement effected the interests of stockholders are sought to be maintained as against the creditors, which would constitute a fraud upon the latter, whose rights are superior, and in view of this fact an implied agreement on the part of the new corporation to assume the indebtedness of the old will be presumed. *Cashman* v. *Brownlee*, 128 Ind. 266, 27 N. E. 560; *Berthold* v. *Holladay-Klotz Land & Lumber Co.*, 91 Mo. App. 233; *Langhorne* v. *Richmond R. Co.*, 91 Va. 369, 22 S. E. 159; *United States Capsule Co.* v. *Isaacs*, 23 Ind. App. 533, 55 N. E. 832; *Shadford* v. *Railroad Co.*, 130 Mich. 300, 89 N. W. 960; *Couse* v. *Columbia Powder Mfg. Co.* (N. J.), 33 Atl. 297; *Tacoma Ledger Co.* v. *Western Home Building Association*, 37 Wash. 467, 79 Pac. 992; *Central Railroad* v. *Paul*, 93 Fed. 878; *Austin* v. *Tecumseh National Bank*, 49 Nebr. 413, 68 N. W. 628; *Blanc* v. *Paymaster Mining Co.*, 95 Cal. 524, 30 Pac. 765; *Blair* v. *Railroad*, 24 Fed. 148; *McVicher* v. *American Opera Co.*, 40 Fed. 861; *Wolff* v. *Shreveport Gas Co.*, 138 La. 743, L. R. A. 1916D 1138, 70 So. 789; *Luedecke* v. *Des Moines Cabinet Co.*, 140 Ia. 223, 32 L. R. A. (N. S.) 616, 118 N. W. 456; *Okmulgee Window Glass Co.* v. *Frick*, 260 Fed. 159.

The authorities in cases falling within the general class above referred to, in most cases, hold that there is a liability at law on the part of the new corporation on the ground that an agreement to assume the debts of the old corporation is implied from the circumstances of the transaction, but some authorities hold the creditor limited to the relief equity will give in voiding the transfer on the ground of fraud or fixing a lien on the transferred property in his favor. *Armour* v. *E. Bement's Sons*, 123 Fed. 56.

The third general class of cases includes those in which a corporation by one transaction disposes of all of its assets for a sufficient consideration other than stock of the purchasing corporation, received by it individually and in which its stockholders do not participate by division, or where that consideration is an agreement by the purchaser to assume and pay certain specified indebtedness.

The general rule in respect to such sales, whereby the corporation disposes of all of its property and practically ceases to do business, leaving unpaid obligations, is that it will be carefully scrutinized and a strict accountabliity for any bad faith discovered will be applied against the purchasing company, but where nothing appears tending to show that the sale was made upon inadequate consideration, or was characterized by bad faith, the purchaser takes the property without liability for payment of the vendor's unsecured debts. *In re Locust Building Co.* 299 Fed. 756; *Hannegan* v. *Denver S. F. R. Co.*, 43 Col. 122, 16 L. R. A., (N. S.) 874, 95 Pac. 343; *Byrne Hammer Dry Goods Co.* v. *Willis-Dunn Co.*, 23 S. D. 221, 29 L. R. A. (N. S.) 589, 121 N. W. 620; *Valley Bank* v. *Malcolm*, 23 Ariz. 395, 204 Pac. 207; *Hawkins* v. *Central Ry. Co.*, 119 Ga. 159, 46 S. E. 82; *Vicksburg and Y. City Tel. Co.* v. *Citizens Tel. Co.*, 49 Miss. 341, 30 So. 725; *Anderson* v. *War Eagle Consol. Mining Co.*, 8 Idaho, 789, 72 Pac. 671; *Chattanooga R. & C. Ry. Co.* v. *Evans*, 66 Fed. 809; *Taenzer & Co.* v. *Chicago, Rock Island & Pacific Ry.*, 170 Fed. 240; *Equitable Trust Co.* v. *United Box Board & Paper Co.*, 220 Fed. 714; *Drovers & Merchants National Bank* v. *Third National Bank*, 260 Fed. 9; *Amer. Ry. Express Co.* v. *Commonwealth*, 190 Ky 636, 228 S. W. 433.

In the last cited case the court said:

It is equally well settled that when a sale is a *bona fide* transaction, and the selling corporation receives money to pay its debts, or property that may be subjected for the payment of its debts and liabilities, equal to a payment of a fair value of the property conveyed by it, the purchasing corporation will not, in the absence of a contract obligation or active fraud of some substantial character, be held responsible for the debts or liabilities of the selling corporation.

Even in those cases in which there was constructive fraud on the creditors by the corporation in the sale of the assets for less than their value, it is held that the purchaser, in the absence of active fraud on his part, will be called upon to answer to creditors of the seller only to the extent of that portion of the property received over and above the value of the consideration paid by him. *Malcolm Savings Bank* v. *Mehlin* (Ia.), 205 N. W. 788; *Tillman* v. *Heller*, 78 Tex. 597; 14 S. W. 700; 11 L. R. A. (N. S.) 628; *Love* v. *Bracamonte* (Ariz.), 240 Pac. 351; *Overstreet* v. *Citizens Bank*, 12 Okla. 383; 72 Pac. 379. See also *Hibernia Ins. Co.* v. *St. Louis Transportation Co.*, supra.

The cases cited by respondent in his brief holding transfers of assets void as against creditors are all cases falling within the first or second general class mentioned above. In *Railroad* v. *Howard*, 7 Wall. 392; *Northern Pacific Ry. Co.* v. *Boyd*, 228 U. S. 482; *Georgia Railway* v. *Paul*, 93 Fed. 878; *Ex parte Savings Bank of Rock Hill*, 73 S. C. 393, 5 L. R. A. (N. S.) 520; and *Jackson* v. *Knights and Ladies of the Orient*, 101 Kans. 383; 167 Pac. 1046, all

cited by respondent, the transfers of assets were transfers in which the consideration paid was enjoyed in part by the stockholders of the selling corporation, either in a division of a cash consideration or in stock of the purchasing corporation, and were properly held to be fraudulent as preferring the rights of stockholders to those of creditors. The case of *Hibernia Ins. Co.* v. *St. Louis & New Orleans Transportation Co.*, *supra*, we have already commented on above. It is not in point with the case before us. In that case a corporation faced with a dangerous lawsuit and chance of a large liability organized a new corporation to which it conveyed all of its assets for stock in that company. The court held that the consideration being stock of the new company, the parties in interest being the same and the consideration paid being much less than the value of the assets conveyed, the new corporation would be considered as assuming the obligations of the old and creditors would not be confined to enforcing their claims against the stock held by the selling corporation. In that case the purpose of the sale was to defraud creditors in placing the assets of the selling corporation beyond their reach.

The record in this appeal shows clearly that the disposition of assets of the taxpayer was under conditions which bring it within the third class mentioned.

It is not liable at law or in equity for the indebtedness of the Fostoria Milling Co. for unpaid income and profits tax for the year 1920 asserted and assessed against that company subsequent to the acquiring of the assets in question by petitioner and which indebtedness was unknown to the taxpayer and petitioner at the time of the transaction in question.

Reviewed by the Board.

*Judgment will be entered for the petitioner.*