## American Railway Express Company v. Commonwealth

(Decided December 10, 1920.)

### Appeal from Harlan Circuit Court.

1. Corporations—Sale of Property—When Purchasing Corporation Not Liable for Debts of Selling Corporation.—A corporation like a natural person may sell its assets and property and when it receives therefor its fair value in money or property the purchasing corporation will not, in the absence of contract obligation, be liable for the debts of the selling corporation.

2. Corporations—Liability of Purchasing Corporation for Debts of Selling Corporation.—When a corporation sells its assets and property without consideration or to defraud its creditors or is merged into a new corporation or the new corporation is merely a reorganization of the old one under a new name or the selling corporation is only paid for what it transfers by stock in the new corporation, the new one will be liable for the debts of the old one.

3. Corporations—Liability of Purchasing Corporation for Debts of Selling Corporation.—When a corporation doing business in this state has in the state sufficient tangible property to pay its debts and it sells all its property to a new corporation and takes in payment therefor stock in the new one the latter will be liable for the debts or liabilities of the old whether in contract or tort or liquidated or unliquidated existing against the old corporation at the time of the sale although the old corporation may have in some other state property out of which its debts created in this state could be collected and retain its corporate existence, but merely for the purpose of winding up its affairs.

ZEB A. STEWART, STOCKTON & STOCKTON, A. M. HARTUNG and TRABUE, DOOLAN, HELM & HELM for appellant.

J. G. and J. S. FORESTER, CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL—Affirming.

The purpose of this suit which was brought in July, 1919, by the Commonwealth of Kentucky, was to make the American Railway Express Company liable for certain judgments amounting in round numbers to $4,000.00 obtained by the Commonwealth against the Adams Express Company in the Harlan circuit court. The lower court gave judgment for the amount asked against the American Railway Express Company, and to have a reversal of that judgment it prosecutes this appeal.

There is no question made in the record  or  in  the
briefs of counsel for the American company, as it will be
called, as to the regularity of the proceedings in which the
judgments were rendered against the Adams company or
as to the validity of the judgments against it. The revers-
al is asked upon the sole ground that under the facts and
circumstances of the case, the American company should
not be made liable for the payment  of  the  judgments
against the Adams company.

Nor is there any disputed issue of fact appearing in
the record, and this being so the correctness of the judg-
ment appealed from must depend on  the  principles  of
law applicable to the case.  Before, however, coming to
consider the questions of law it will be necessary to set
forth the material parts of the pleadings in the case as
well as so much of the evidence as shows the circumstan-
ces under which the American company acquired the busi-
ness and property of the Adams company.

The suit was brought by the Commonwealth against
the Adams company and the  American  company  and
after setting up the judgments against the Adams com-
pany and the fact that executions issued on the judgments
had been returned by the officer in whose hands they had
been placed, "no property found," it was further aver-
red that about June 25, 1918, the defendant American
company was organized for the express purpose of taking
over and becoming the owner of all  the  property  and
rights of the Adams company and  other  express  com-
panies doing a railroad express company business in the
United States; that the Adams company  on  that  date
transferred and turned over all of its property of every
kind, character and description in  Kentucky  and  the
United States to the American company and received as
the only consideration  therefor  capital  stock  of  the
American company of the par value of $8,000,000.00; that
the Adams company in this transfer and sale delivered to
the American company, property situated in Kentucky
of the value of many thousands of dollars, including its
office and business in the county of Harlan from which a
monthly income of about $10,000.00 was realized.   It was
further averred that the American company was indebt-
ed to the Adams company on account of dividends due on
the stock it transferred to the Adams company in a sum
in excess of the amount of the judgment.

On motion of the Adams company the summons issued
against it and which was executed on the agent for the

American company at Harlan, Kentucky, was quashed upon the ground that he was not at the time of the service of the summons the agent of the Adams company and no appeal is prosecuted from this order.

A general demurrer to the petition filed by the American company was also overruled and thereupon it filed its answer, in which, after denying in a general way that it was organized for the purpose of taking over the property and business of the Adams company and other express companies and also that the Adams company had transferred to it all of its property of every kind, character and description, admitted that "in good faith without fraud and for a valuable consideration the Adams company had transferred and sold its property in the state of Kentucky to the American company."

It further denied that it was indebted to the Adams company in a sum in excess of the judgments as dividends on the stock delivered by it to the Adams company or in any sum on account of or growing out of any other transaction or that it held any property or choses in action or evidences of debt in which the Adams company or its stockholders had any interest.

The affirmative matter in this answer was by agreement denied of record, and so the petition and answer constitute the only pleadings in the case.

Thereafter the depositions of Clark and Degnon, the only witnesses who testified in the case, were taken. Clark, who was an officer of the American company, testified that: On July 1, 1918, the American company purchased from the Adams company and other express companies all of their tangible property used or formerly used in express transportation operations throughout the United States, including the state of Kentucky.

"Q. I believe that you may state in your own way for the information of the court a brief history leading up to the sale and transfer of the property of the Adams company in Kentucky to the American company? A. After continued negotiations at Washington, the director general of railroads advised the executives of the express companies that he would not deal with more than one express company to operate over all federal controlled lines in the United States. Therefore, the old express companies were estopped from the right to carry on the express transportation business beyond June 30, 1918. Thereupon a new corporation was organized by the name

of the American Railway Express Company which was successful in concluding a contract with the United States Railroad Administration for the operation of the express service over federal controlled lines throughout the United States, such contract to become operative on July 1, 1918.

"The old express companies having no use for the tangible property used by them in the express transportation business and the new company having great need for this identical property, which in many respects is peculiar to the express companies, the American Railway Express Company contracted for the purchase of this tangible property used in express transportation over all the lines formerly operated by the old express companies, and this purchase and transfer of this tangible property was effected at midnight, June 30, 1918, for a valuable consideration on the part of the American Railway Express Company, thereby enabling it to continue the express transportation business without interruption.

"Q.   I will ask you to state whether or not the Adams Express Company as a corporation, or rather a joint stock company, is or not still in existence with executive officers? A.   The Adams Express Company is still in existence as a separate entity, with executive offices and officers in New York city.   Q.   Is there or not any contract in existence between the Adams Express Company and the American Railway by the terms of which the American Railway Express Company has agreed, assumed, contracted or undertaken to pay the liabilities, debts and judgments of the Adams Express Company? A. There is not and has not been such a contract.   Q.   On July 1, 1918, or about that date, did the American Railway Express Company own any property or have any assets of its own before the property of the other express companies was transferred to it?   A.   It had not.

"Q.   What other express companies besides the Adams transferred their property to the American Railway Express Company?   A.   The Adams Express Company, the American Express Company, the Southern Express Company, Wells Fargo & Company, Great Northern Express Company, Northern Express Company and Western Express Company sold their tangible property used in the express operations to the American Railway Express Company.   Q. What was the whole consideration for this property purchased from these various express companies by the American Railway Express Company?

A. Approximately $33,000,000.00. Q. And what was the invoiced or agreed price of the property of the Adams Express Company turned over to the American Railway Express Company? A. The depreciated book value of each individual piece of property on July 1, 1918. Q. And what did it amount to in dollars? A. Why, in round numbers $8,000,000.

"Q. I believe you have stated that the Adams Express Company bought some stock and paid cash for it from the American Railway Express Company. How much of the stock did the Adams buy and pay cash for? A. In round numbers between three-quarters of a million and one million dollars. Q. What did the American Railway Express Company do with the three-quarters of a million dollars which you say the Adams stockholders paid for stock in the American Railway Express Company? A. The cash subscription which was made to the American Railway Express Company for capital stock was used as a working fund with which to carry on its business, purchase supplies and generally to maintain its property. Q. Can you reasonably find out the value of the Adams Express Company's property that was turned over in Kentucky to the American Railway Express Company? A. No, I can not. It was all bulk.

"Q. To whom was the eight million dollars or more stock of the American Railway Express Company, which represented the value of the property of the Adams Express Company, turned over? A. To the Adams Express Company. Q. Was it turned over to the individual stockholders of the Adams Express Company or to the Adams Express Company as a joint stock company? A. To the Adams Express Company as a joint stock company."

Thomas H. Degnon, an officer of the Adams company testified as follows: Q. Please state whether or not you know whether the Adams Express Company ceased to do an express business on July 1, 1918? A. It did cease. Q. Is the Adams Express Company still in existence? A. Yes. Q. Please state whether or not, if you know, the Adams Express Company at the time of the transfer of the property used in the express business in the United States to the American Railway Express Company transferred its entire assets, tangible and intangible, of every description to the American Railway Express Company? A. It did not. Q. Was there any assets reserved by it

at the time of this transfer? A. There were. Q. Has the Adams Express Company in your estimation still assets sufficient to meet its outstanding liabilities? A. I believe it has. Q. Has it any tangible property to your knowledge? A. It has. Q. Has it any real estate to your knowledge of which it is the owner? A. Yes. Q. Did the Adams Express Company on July 1, 1918, retain any property of any kind in Kentucky that it owned at that date? A. It did not. Q. Has it now any property of any kind in Kentucky? A. It has none to my knowledge.

"Q. This suit is to force the collection of judgments rendered by the Harlan circuit court, Harlan, Kentucky, against the Adams Express Company, amounting to. $4,-110.10, including costs. Has the Adams Express Company thought anything about paying these judgments or does it not intend to pay them unless it is forced to do so? A. I don't know anything about it. Q. About what value of property did the Adams own in Kentucky prior to July 1st, and up to that date—1918? A. I have no knowledge or, rather, recollection. Q. It did have a business in Kentucky and had property in Kentucky? A. It did. Q. What kind of property did it own in Kentucky? A. Principally horses, wagons, equipments of various kinds, and, I believe, some real estate. Q. How was that real estate transferred—by deed or otherwise? A. By deed. Q. What did the Adams Express Company receive for this property in Kentucky which it transferred to the American Railway Express Company? A. Shares of stock of the American Railway Express Company, either received or to be received. Q. Were the stockholders of the Adams Express numerous—many of them or only a few? A. Approximately three thousand. Q. Is the Adams Express Company engaged in any kind of actual business now? A. No. Q. For what purpose does it still retain its organization as a joint stock company? A. It still has assets undisposed of and also obligations to be settled. Q. It is retaining its organization for the purpose of winding up its affairs only, is that what I understand you to say? A. That is all it has been doing up to this time.

"Q. Do you know what understanding, either in writing or otherwise, there existed between the American Railway Express Company, after July 1, or on July 1, 1918, for the payment of the outstanding obligations of the Adams Express Company at that date? A. There

was an understanding between them.  Q.  If you know, state what that understanding was in that regard?  A. The understanding defined that the American Railway Express Company would undertake to settle outstanding obligations of the Adams Express  Company  solely  for Adams Express Company's account without the assumption of any liability on the part of the American Railway Express Company, the Adams Express Company keeping the American Railway Express Company in funds sufficient to do so.

"Q. . Do you know the amount of cash for  the  purchase of the stock of the American Railway Express Company paid by the Adams Express Company?  A.  Nine hundred thousand and some odd dollars.  Q.  Did the Adams Express Company receive from the American Railway Express Company, any cash or property consideration for any of its tangible property which the Adams turned over to the American Railway Express Company? A.  Not to my knowledge.  Q.  The only thing that the Adams company got from the American was stock?  A. That is all.  Q.  State whether or not in your judgment the Adams Express Company in  Kentucky  owned  and turned over to the American Railway Express Company tangible property of the value of over $5,000?  A.  I believe so.  Q.  Was this sale and transfer of this property in Kentucky by the Adams Express Company made with the intention to defraud any creditors of the Adams Express Company?  A.  I do not believe so.  Q.  Approximately to the best of your judgment what is the value of the real and tangible property now owned by the Adams Express Company which it did not sell and transfer to the American  Railway  Express  Company?  A. According to the recent compilation by accountants, the company had property of value in round figures $2,700,-000 in excess of liabilities which it did not sell or transfer to the American Railway Express Company.  Q.  And does the Adams Express Company still own this property?  A.  The Adams Express Company still  owns  that property."

On this evidence the outstanding facts in  this  case may be stated in this way: (a) there was no merger or consolidation of  the  two  companies.  The American simply bought, and paid for in its stock, all of the property of every kind, character and description employed by the Adams in the express business, and took its place as an express company, the transaction being untainted

by actual fraud of any description.    (b) The American did not pay to the Adams any consideration except the issual of its stock to the Adams to the amount of $8,000,000, and this stock although delivered to the Adams company, was delivered to it, as we will assume, to be held by it as trustee for the use and benefit of its stockholders, or to be delivered by it to the stockholders in proportion to their respective rights.    (c) Before the sale, the Adams had ample tangible property, including real estate, in this state out of which the judgment could have been satisfied, and after the sale it had in this state no property of any kind or character that could be subjected to the satisfaction of the judgment; nor were any of its stockholders residents of this state.    (d) The Adams had in New York or some other state after the sale assets sufficient in value to satisfy the judgment, but whether these assets could be subjected to its payment is not certain, nor is it material whether this could or not be done.    (e) Immediately upon the sale, the Adams ceased to do business as an express company, leaving no agent in the state for the service of process but retained its corporate identity merely for the purpose of winding up its affairs.    (f) The sale and transfer simply had the effect of putting the American company in consideration of its stock in the possession of all the property used by the Adams and other express companies in the conduct of their business and it continued to carry on the express business just as the selling companies had carried it on before the sale.    We may also here state that under our constitution and statutes the Adams although a joint stock company organized under the laws of New York is to be treated in this state as a corporation.    Whether its stockholders are personally liable for its debts, as in the case of a partnership, we are not able to say as we are not advised concerning the statutes of New York or the articles of association under which it was organized.    And so, under these circumstances, we will treat it as a corporation.

On these facts, the precise question before us is: will a purchasing corporation that has paid the full purchase price to the selling corporation by the issual of its stock to it be responsible in law to the extent of the value of the property received, for the debts or liabilities, whether liquidated or unliquidated, or sounding in contract or tort, that were outstanding against the selling corporation at the time of the sale, when the effect of the sale is to leave the selling corporation without any property in the

state in which the liability accrued to satisfy it, although except for the sale it would have had ample property in the state, that could have been subjected to the payment of the liability, and may have property in some other state that could be subjected to the payment of the liability?

Questions concerning the responsibility of the purchasing corporation for the debts and liabilities of the selling corporation have come before the courts of the country in many cases, and it is held practically without dissent that although the purchasing corporation does not assume the payment of any of the debts or liabilities of the selling corporation, it will yet be made responsible for them if there was no consideration for the sale, or if it was not in good faith but for the purpose of defeating the creditors of the selling corporation, or where there has been a merger or consolidation of the corporations, or where the purchasing corporation took over from the stockholders, all of the stock of the selling corporation, or where the transaction amounts to a mere reincorporation or reorganization of the selling corporation.

It is also generally agreed that when these conditions exist the purchasing corporation will be responsible for all the debts and liabilities of the selling corporations without reference to whether these debts or liabilities were created by contract or arose out of tort, or were liquidated or unliquidated.

It is equally well settled that when the sale is a *bona fide* transaction, and the selling corporation receives money to pay its debts, or property that may be subjected to the payment of its debts and liabilities equal to the fair value of the property conveyed by it, the purchasing corporation will not in the absence of a contract obligation or actual fraud of some substantial character be held responsible for the debts or liabilities of the selling corporation. Many illustrative cases fully supporting these propositions may be found in Vol. 5, Thomson on Corporations, sec. 6517; 7 R. C. L. p. 180; 10 Cyc. 307; Notes in 11 L. R. A. (N. S.) 1119; 32 L. R. A. (N. S.) 616; 47 L. R. A. (N. S.) 1058.

The facts of this case do not, however, bring it directly within these rules about which there is no disagreement in the authorities, and so the American company can only be made liable, if at all, for the payment of these judgments upon the grounds (a) that it was a mere continuation of the Adams under a new name, (b) that the

only consideration paid to the Adams was paid in the capital stock of the American company and (c) that the Adams company on account of the sale has no property or assets of any kind or character in this state that can be subjected to the payment of the judgments. These questions we will now proceed to consider.

In Camden Interstate Railway Co. v. Lee, 27 Ky. L. R. 75, the facts were these: Lee, in a suit to recover damages for personal injuries, obtained in February, 1901, a judgment against the Ashland & Catlettsburg Street Railway Co., upon which an execution was issued and returned "no property found." Rose Hoffman also had a judgment, in a damage suit in February, 1901, against this company. While these suits were pending, J. M. Camden purchased the stock of the street railway company under an arrangement with the stockholders by which they agreed to take stock in the Camden Interstate Railway Company in exchange for the stock they held in the street railway company and thereafter a deed was made by the street railway company to the Camden Interstate Railway Company, conveying to it all of its property. As a result of this, Lee and Hoffman were unable to obtain satisfaction of their judgments against the street railway company and thereupon sought to make the Camden Interstate Railway Company liable for the judgments. In the sale the Camden company did not assume the payment of any of the debts or liabilities of the street railway company. In holding the Camden company liable, the court said:

"The sum of the transaction was that Camden either owned in his own right all the stock of the street railway company by way of purchase, or controlled it under contracts by which the stockholders agreed to take stock in the new company for the stock which they held in the old, and while he thus controlled all the stock in the street railway company, he caused that company to deed all of its property and franchises to the Camden Interstate Railway Company, and thus the stockholders in the street railway company became stockholders in the interstate company. In this way the stockholders in the street railway company put all of their property and franchises in the hands of the interstate railway company, and became stockholders in that company in lieu of the street railway company. By this means, the interstate railway company swallowed up or absorbed the street railway company."

In Harbison-Walker Refractories Co. v. McFarland's Admr., 156 Ky. 44, it appears that McFarland's administrator obtained a judgment against a corporation styled Harbison & Walker Company, that was solvent when the liability that resulted in the judgment accrued. After the accrual of the liability the owners of the stock of this company incorporated a new company, and thereafter the stockholders in both of these companies incorporated the Harbison-Walker Refractories Company for the purpose of taking over the property of the other two corporations and doing a like business. Pursuant to this arrangement the Harbison & Walker Company transferred all of its property to the new Harbison & Walker, and this corporation in turn transferred all of its property to the refractories company. These several transfers were accomplished merely by the purchasing companies taking over the assets of the selling companies, and issuing stock of the buying companies to the stockholders of the selling companies in lieu of their stock. After this, the administrator of McFarland brought suit against the refractories company to compel it to pay the judgment he had obtained against the Harbison-Walker company; and, in holding it liable for this judgment, the court said:

"The 'Harbison & Walker Company, Southern Department,' as well as the Portsmouth Harbison-Walker Company, were, in reality, merged into the greater corporation, the refractories company, and the method of accomplishing that end can not change the rights of creditors, since it resulted in a transfer of all the assets of the first-named company to the refractories company, without leaving with the selling company the purchase price of the assets so sold. In the case at bar the refractories company took over all the assets of the 'Harbison & Walker Company, Southern Department,' which was the original debtor, leaving it a mere shell, and without leaving with it any money or property whatever as a consideration for the sale of its assets. There was no liquidation of the 'Harbison & Walker Company, Southern Department,' by selling its assets and paying its debts; on the contrary, there was a transfer of all of its property to the refractories company without any attempt to pay appellee's debt. A subsidiary corporation can not thus escape the payment of its liabilities. It is true these sales and transfers were all made by deeds of conveyance, and that the corporation had the right to sell its assets in that way, if it chose so to do; but the decision of this case

depends upon the broad equitable principle that where one corporation takes over the assets of another corporation, without paying to it any consideration therefor, as is the fact in this case, the absorbing corporation takes the assets of the absorbed corporation *cum onere.*"

In Justice's Admr. v. Catlettsburg Timber Company, 168 Ky. 665, a creditor of the Catlettsburg Timber Company, sought to hold liable the Dawkins company that purchased the assets and property of the Catlettsburg company, paying therefor a fair and valuable consideration in money. In holding that the purchasing corporation was not liable for the debts of the selling corporation the court said:

"The law is well settled that where one corporation voluntarily conveys all its assets to another corporation, and thus practically ceases to exist, without having paid its debts, the purchasing corporation takes the property subject to an equitable lien or charge in favor of the creditors of the selling corporation, who may follow the corporation's assets, or the proceeds thereof, into the hands of whomsoever they can trace them, and subject them to the payment of the corporation's debts, except as against a *bona fide* purchaser for value. The rule does not operate, however, to disturb sales made in good faith, and for value, or in satisfaction of valid liens." To the same effect are Martin v. Sulfrage, 159 Ky. 363; Carter Coal Co. v. Clouse, 163 Ky. 337; Kentucky Distilleries and Warehouse Company v. Webb's Executor, 181 Ky. 90; Louisville and Nashville Railroad Co. v. Biddell, 112 Ky. 494.

The case of Chesapeake, O. & S. W. Railroad Co. v. Griest 85 Ky. 619, apparently laid down principles somewhat at variance with these later cases, but what was said in the Griest case was not approved or followed in any of them.

In Jennings, Neff & Co. v. Ice Co., 128 Tenn. 231, 47 L. R. A. (N. S.) 1058, it appears that the Crystal Ice Company, a Georgia corporation, transferred all of its property to the Atlantic Ice & Coal Company, a Virginia corporation, and the Crystal Ice Company ceased to do business but retained its corporate entity for the purpose of winding up its affairs. Prior to this sale, Jennings, Neff & Co., had brought suit against the Crystal Ice Company, and this suit was pending at the time of sale. After the sale, it obtained judgment against the Crystal company, upon which execution issued and was returned "no property found."

In the transaction, the Atlantic company assumed the payment of certain debts of the Crystal company, but not the debt of Jennings, Neff & Company. Aside from this, the only consideration received by the Crystal company for its tangible property in Tennessee, which was valued at about $300,000.00, was stock and bonds of the Atlantic company, which were distributed to the stockholders of the Crystal company. In a suit by Jennings, Neff & Company to make the Atlantic company liable for its judgment against the Crystal company, the court, after stating the familiar doctrine that corporate assets are a trust fund for the payment of the debts of the corporation, a principle that has been time and again announced by this court, said:

"It follows that when this purchasing corporation took over in exchange for its own stock and bonds the assets of the other, and permitted these securities which it had substituted for the visible, tangible property of the selling corporation to be distributed among the shareholders of the latter, without provision for the creditors of the latter, it thereby became a party, with full notice, to the diversion of a trust fund. As such, the purchasing corporation holds the property so acquired impressed with the same trust with which said property was originally charged, and the purchasing corporation is liable to the creditors of the selling corporation to the extent of the value of the property thus obtained.

"Creditors of the old corporation can not be required to look alone to the stock and bonds which were substituted for the real, tangible assets of that corporation. The value of securities so substituted is more or less problematical, and creditors should not be forced to surrender their claim against available visible assets, and transfer such claim to new securities. Their remedy can not thus be hindered and impaired for the benefit of stockholders.

. . .

"Furthermore, these were securities of a foreign corporation, and were distributed among non-residents of the state, and we are unwilling to approve any device by which tangible property of a corporation located here and subject to the debts of that corporation can be withdrawn from the reach of creditors and distributed among non-resident stockholders. Corporate creditors may not be thus deprived of available security for their claim and forced to resort to difficult and inconvenient litigation in foreign states."

In Grenell v. Detroit Gas Co., 112 Mich. 70, a judgment creditor of the Michigan Gas Company sought to make the Detroit Gas Company, the purchaser of the Michigan Gas Company, liable for a judgment against the selling company. In that case the Detroit Gas Company was organized for the purpose of taking over the business of the Michigan Gas Company, and pursuant to this arrangement it purchased all of the property and assets of the Michigan Gas Company and paid for the same by its shares of stock. The court said:

"If this transaction be viewed in the light that the defendant appears to desire it to be, viz., that these corporations are separate entities, and that the Detroit Gas Company purchased the property of the Michigan Gas Company, yet the bill shows that such purchase included all of the property of the vendor. It must have known, or, if not, it was its duty to understand, that nothing was reserved to pay outstanding indebtedness, if there were any. It paid nothing to its vendor for this plant, but dealt with its stockholders, paying to them, in its own capital stock, the price of its purchase; thus, in effect, closing out the corporate business, and dividing its assets among its stockholders. Under such circumstances, we think a legitimate inference is that the purchase was made subject to the application of so much of the property as might be necessary to the payment of the debts of the Michigan Gas Company, if not with the understanding that all debts should be paid by the purchaser. Again, a corporation can not sell all of its property, and take in payment stock in a new corporation, under an arrangement that has the effect of distributing the assets of the vendor among its stockholders, to the exclusion and prejudice of its creditors; and a company making such a purchase, in consideration of an issue of its own stock to such stockholders, takes the property subject to the rights of creditors. Such an arrangement is a diversion of the trust fund.

"It is said that there is nothing to show an intention to defeat the creditors of the Michigan Gas Company, as this was not a liquidated claim at the time this transfer was made. Under the arrangement, the promoters and stockholders of the Detroit Gas Company knew that it was getting all of the property of the Michigan Gas Company, without provision for its debts, if there were any. It was bound to know that this property was charged with such debts, and ought not to be distributed among the

stockholders to the exclusion of creditors. It was a party, then, to a diversion of the trust fund, and, having in its possession such fund, holds it subject to the payment of debts. It can not be called a *bona fide* purchaser of the property, as against existing creditors.''

Another instructive case is Hibernia Insurance Company v. St. Louis and New Orleans Transportation Company, 13 Fed. Rep. 516; in that case it appears that the Baggage Transportation Company sold all of its property to the St. Louis and New Orleans Transportation Company in consideration of stock in the latter company and the payment of certain of its debts. The stockholders in the two companies were substantially identical. The suit was to require the purchasing corporation to pay a debt due by the selling corporation, and the court said, "The fair inference from the transaction is that the old company was about to be dissolved, and to cease to be. It was to be absorbed by the new company. This is the inevitable consequence of the formation of the new company, composed substantially of the same persons, to transact the same business at the same places, and with the same property. By the transfer, the creditors of the old company were deprived of the means of enforcing their claims. Probably no officers of the old company have since been elected, and it is to be presumed that none will be. This being so, it is at least doubtful whether service of process could be obtained so as to procure a judgment at law against the old company. And if a judgment were obtained, it could not be collected out of any assets in the possession of the old company because it had turned all its assets over to the new company. It has received, it is true, paid-up stock in the new company, but that has doubtless been disposed of; or, if it has not been, it may at any moment be transferred. Equity will not compel the creditor of a corporation to waive his right to enforce his claim against the visible and tangible property of the corporation, and to run the chances of following and recovering the value of shares of stock after they are placed upon the market.

"A distinction with respect to transactions of this character exists between a corporation and a natural person. A natural person may sell all his property for a fair consideration, if the transaction is *bona fide,* and the buyer will not be required to take care that the seller provides for and pays all his debts. A corporation, unlike a natural person, by disposing of all its property, may

not only deprive itself of the means of paying its debts, but may deprive itself of corporate existence, and place itself beyond the reach of process at law.   At all events, equity can not permit the owners of one corporation to organize another, and transfer from the former to the latter all the corporate property, without paying all the corporate debts; and that is the exact case now before us.

"Here was a corporation engaged in a profitable business, and owning and possessing property valued at $92,-000.00 exclusive of its franchise.   It owed debts confessedly amounting to more or less than the value of its property.   It ceases to transact business.   Its stockholders organized themselves into another corporation, and all the property is transferred from the old to the new.   It matters not that the stockholders in the two companies may not be precisely identical.   We are not prepared to say that it would make any difference if the members of the new company were none of them interested in the old. The thing which we pronounce unconscionable is an arrangement by which one corporation takes from another all its property, deprives it of the means of paying its debts, enables it to dissolve its corporate existence and place itself practically beyond the reach of creditors, and this without assuming its liabilities.   The fact here, however, appears to be that the owners of the two corporations are substantially identical, and hence there is a still stronger case in equity."

Another very pertinent case is Altoona v. Richardson, 81 Kan. 717.   In that case the Richardson Gas and Oil Company, a corporation, at a time when it was indebted to the city of Altoona transferred all its property to the Altoona Portland Cement Company in consideration of $600,000 of the common stock of the latter company which continued the same business the Richardson company had been engaged in.   Thereafter the city sued and obtained judgment against both companies for its indebtedness.

There was no serious question as to the liability of the Richardson company, but the Altoona company contended that it occupied the attitude of an ordinary purchaser of property and not having contracted to pay the indebtedness of the Richardson company it was under no obligation to do so; on the other hand the city insisted that the transaction between the two corporations was a virtual if not a technical consolidation—that the new company was a successor of the old and liable for its debts.

In considering the case and holding the purchasing corporation liable the court said, ''In the present case it was not positively and directly proved that the old company distributed among its stockholders the stock in the new company which it received in consideration of the transfer of its property, but that is inferrable from the evidence.'' And further said, ''We thing it consistent with the weight of authority and in accordance with sound reason to hold that the equitable right of the creditor to look for payment to the property of a debtor corporation is superior to any title that can be acquired through such a transaction as that here disclosed. We affirm the judgment upon the ground that where a corporation becomes practically extinct, transferring all its assets to another and receiving in return stock in the other corporation, which succeeds to its business, the new corporation is liable, to the extent of the value of the property acquired, for the debts of the old one. Such an arrangement is essentially a merger, and should be attended with the same consequences as a consolidation.''

In the editorial note to Luedecke v. De Moines Cabinet Company, 32 L. R. A. (N. S.) p. 617, it is said, that, ''the transfer of one corporation to another may amount to a merger in fact although the corporate existence of the transferrer corporation continues. In such case equity looks past the form and at the real effect of the transaction and by an application of the trust-fund doctrine holds the transferer liable to the extent of the assets received as in such case it is not a *bona fide* purchaser for value.''

In Chicago Railroad Company v. Taylor, 183 Ind. 240, the court said: ''Where the property is taken without compensation to the original company other than the issuance of stock to it in the new organization the latter should be charged with such unpaid claims as exist against the property taken, at least in an amount equal to the value of such property.''

Many other cases announcing principles similar to those set forth in the ones quoted from might be referred to but those noticed are amply sufficient for the purposes of this case and give abundant support to the conclusion we have reached that the American company should be held liable for the claim sued on.

It is true that in the cases referred to it appeared that the purchasing corporation had bought all the assets and

property of the selling corporation, while in this case it appears that the selling corporation has some property in another state, but we do not regard this circumstance as sufficient to defeat the wholesome principle running through these cases that the rights of creditors are superior to the rights of stockholders and a corporation will not be allowed to defeat its just obligations by sale or transfer of its property for no other consideration than stocks and bonds in the purchasing corporation. We have merely extended this wholesome principle for the better protection of creditors and this without prejudice to the rights of selling or purchasing corporations that desire to do what is right by the creditors of the selling corporation.

A careful consideration of the facts in all these cases and the conclusions of the courts make it clear that the circumstance that was ultimately seized hold of to make the purchasing corporation liable, was that the selling one was paid for its property in the stock of the purchasing corporation, and the property of the selling corporation to which the creditors might look with certainty for the payment of their debts was turned over to the purchasing corporation; and cases involving questions like the one we have, disclose the further fact, that when one corporation sells its property and business to another, it is usually the case, that the selling corporation takes its pay in the stock of the purchasing concern.

But the courts looking through the various forms invented to impart not only validity to the transaction but to save the purchasing corporation from liability for the debts of the selling one, have in almost every case in which the selling corporation received nothing more than stock, held the purchasing corporation liable for the debts of the selling corporation; when, however, money or property of fair value was delivered as the purchase price, the purchasing corporation in the absence of fraud or contract obligation was relieved from liability.

All the cases also hold that where there is a merger, or consolidation or reincorporation or reorganization and a continuance of the business under a new name the corporation taking over the assets and property of the corporation extinguished for all practical purposes will be liable for its debts, and as before said, in virtually all this class of cases, the corporation that went out of business was paid for its property in stock of the new corporation.

Keeping these rulings in mind it is difficult to find any substantial difference between the methods of absorption often employed, as in the case of a merger or reincorporation or reorganization, and a straight out sale like the one here in question when the selling corporation gets nothing but stock in the purchasing one.

It is true there is no direct evidence that the stockholders of the Adams received or will receive in exchange for their stock, the stock of the American that was delivered as shown by the evidence to the Adams, but it is fair to, and we will, assume that this stock was turned over to the Adams for distribution to its stockholders as their rights may appear because they owned the whole beneficial interest in the property that was given up for this stock and the clear inference is that the Adams as a corporate entity holds this stock in trust for its shareholders or to be delivered to them.

Neither should it be overlooked that the record shows that the American was organized for the sole purpose of taking over the property and business of and pursuant to this arrangement did take over the business and all the property employed therein of the Adams and the other express companies and continued under a new name and a new organization the precise business they were engaged in, nor is it open to doubt that the great bulk of its stock is owned by the stockholders in these old companies although there may be many new shareholders. Indeed it would not be wide of the mark to say that the American under a new name and new organization was merely a continuation of all the old companies, as this was in effect the result of the sale and transfer of the business and property of the old ones to the new.

But it is said that the Adams is yet a corporation and owns property more than sufficient to satisfy its debts. It is true that it yet has a corporate existence but no suit, can be maintained against it in this state and all of its property that had a situs in this state has been taken from it. So far as Kentucky creditors are concerned it is nothing more than a mere shell and a very empty one at that. If it owns tangible property of value none of it is in this state and more than likely it has none outside the state that can be seized and subjected by pursuing creditors. At any rate it is plain that the creditor in this state in order to make his debt, would be required to go to the state of New York, and find there, if he could,

property to satisfy his debt, and then resort to the courts of New York to try and collect it.   We say this because the Adams company so far as this record shows has no disposition to pay this debt and we may assume will resort to every possible means to defeat its collection.

Of course, a corporation may sell its property and all of it of every kind, just as any natural person may, and when it does this and receives its fair value in money to pay its debts, or property that the creditor can subject to the payment of its debts, a purchaser in the absence of a contract obligation can not be held for the debts and liabilities of the selling corporation.

But when the selling corporation disposes of all its property and takes for it shares of stock in the purchasing corporation and both the buyer and seller refuse to pay the debts of the seller it is perfectly plain that the rights of creditors of the seller have been prejudiced by the sale, as to them the sale is constructively fraudulent and for this reason courts will hold the purchasing corporation liable for the debts of the selling one.

The substantial difference between a corporation and an individual, so far as the sale of all its or his property is concerned, is that the corporation is a creature of the law. There is no personal liability.   All it has for the payment of its debts is its property and assets, and the law, for the protection of creditors, has impressed this property with a trust character for the payment of the debts and said that the corporation holds it for the benefit of its creditors and when it parts with this property, getting in return nothing the creditor can subject, the law will follow the property into the hands of the taker and make it liable to the extent of the value of the property received.

When the American bought the Adams, that company had for years been engaged in an extensive business throughout the United States and the American must have known that it had liabilities, but no provision whatever was made for their payment, and it now says to the creditors of the Adams in Kentucky, if you want your money go to the state of New York and try to get it.   We will not give our sanction to a scheme like this, and the conclusion we have reached is supported by abundant authority.

Under all the facts and circumstances of this case, the American might well be held liable on the theory that it was merely a continuance of the old companies under a new name.   We prefer, however, to put our decision upon

the distinct ground that when one corporation, foreign or domestic, takes over the business and property of another that had in this state sufficient tangible property subject to execution to satisfy all its debts in this state, and pays for the property so taken over in nothing more than its stock, it becomes liable to state creditors of the selling corporation to the extent of the value of the property it has received in the sale, although the selling corporation may retain its corporate entity for the purpose of winding up its affairs, and have in some other state, property that might be subjected to the payment of its debts, and this upon the ground that such a sale is constructively fraudulent.

This rule is not an unreasonable or harsh one nor will it in any manner interfere with the sale by a corporation of its property and business or subject to loss the purchasing corporation if it uses reasonable care, as it may easily do, to protect itself from the liabilities of the selling corporation. All it need do is to make arrangements in the articles of sale for the payment of the debts of the selling corporation to the extent of the value of its property conveyed or pay for this property in money or other things of value that the creditors of the selling corporation may look to for the payment of their debts.

In view of the multitude of various enterprises in which corporations are engaged and the fact that creditors can only look to the property of the corporation for the payment of their debts it is nothing more than just and reasonable that the corporation should not be allowed to dispose of its property and business without getting something in return to pay its debts.

In considering this case we have not thus far noticed the authorities relied on by counsel for the American company, the principal one being McAlister v. the American Railway Express Company, 103 S. E. Rep. 129. In that case as in this the American company took over the business and property of the Southern Express Company at the same time and for the same reason and under the same circumstances that it took over the property and business of the Adams company.

McAlister in that case sought to make the American liable for a claim he had against the Southern. The facts of the two cases are as nearly alike as the facts of two cases could well be, but the North Carolina court reached the conclusion that the American company was not liable, putting its decision upon the ground that the purchasing

company in the absence of contract obligation or fraud can not be held liable for the debts of the selling corporation when there has been no merger or consolidation and the selling corporation does not become extinct and retains sufficient property to pay its debts.

We do not, however, find ourselves willing to agree with the North Carolina court although its decision finds some support in the authorities. We are well satisfied that the great weight of modern authority as well as the right of the case supports the conclusion we have reached.

Wherefore the judgment is affirmed.