INTRODUCTION
ROGERS, Circuit Judge.
James D. Lyon, Trustee for Wright Enterprises, appeals from the judgment of the district court in this bankruptcy proceeding. The district court upheld the bankruptcy court’s conclusion that certain of the defendants were entitled to summary judgment because the undisputed evidence showed that ah claims between these defendants and Wright Enterprises had been settled prior to Wright Enterprises’s bankruptcy. The district court also upheld the bankruptcy court’s conclusion that the other defendants were entitled to summary judgment because, as a matter of law, they could not be held liable as a successor corporation to another corporation’s debts to Wright Enterprises. Finally, the district court held that the bankruptcy court did not abuse its discretion in denying the Trustee’s motion for an extension of discovery. We REVERSE the district court’s order affirming the bankruptcy court’s decision and REMAND for further proceedings consistent with this opinion.
*358 BACKGROUND
Southern Gas Company, Inc. (“Southern Gas”) was formed in 1983 by Leonard K. Nave[1] and Wright Enterprises to engage in the natural gas business. Leonard Nave and Wright Enterprises each owned 50 percent of Southern Gas. A few months later Wright Resources, Inc. (‘Wright Resources”), a holding company, was formed, and Southern Gas became its wholly-owned subsidiary. Wright Resources was owned by Wright Enterprises (50 percent; 440 shares), Leonard Nave (25 percent; 220 shares), and Eugene Mooney (25 percent; 220 shares). Lyle Robey, counsel and chief executive officer of Wright Enterprises, served as the president and treasurer of Wright Resources, Eugene Mooney served as secretary, and Leonard Nave served as vice president.
Leonard Nave also served as the president of Southern Gas from its inception in 1983 until its dissolution in 1994. Other officers of Southern Gas included defendant Karen Underwood, who served at various times as secretary and vice president, defendant Rick Avare, who served as treasurer from 1986 until the company’s dissolution, defendant Wil Kowalke, who served as vice president in charge of marketing, and defendant William F. Nave, II, who served as vice president in charge of field operations.

1. The 1980s Loans from, Wright Enterprises to Southern Gas

In 1984, Southern Gas purchased Alpha Gas Development Company, Inc. (“Alpha Gas”), from A1 Keyser, Jr., in exchange for a $750,000 promissory note and 100 shares of stock in Southern Gas. A1 Keyser, Jr., was the sole shareholder of Alpha Gas, and thereafter Alpha Gas became a wholly-owned subsidiary of Southern Gas. A1 Keyser, Jr., later sold his 100 shares of stock in Southern Gas to Wright Enterprises.[2]
During the mid to late 1980s, Wright Enterprises acted as guarantor on loans in excess of $1 million made to Southern Gas and Alpha Gas.[3] Wright Enterprises also loaned substantial sums to Southern Gas and Alpha Gas, and made other payments to financial institutions on behalf of Southern Gas and Alpha Gas during this time period. Southern Gas, unable to repay the loans received from Wright Enterprises, issued 500 shares of stock to Wright Enterprises in 1987, and thereby converted the principal on the loans into a capital contribution. 500 shares of Southern Gas stock represented one third of the total stock outstanding in Southern Gas at that time. According to Leonard Nave, at this point Wright Resources owned the other 1,000 shares in Southern Gas.
Wright Enterprises was also acquiring some of Southern Gas’s assets during the same period in the 1980s. In January 1986, Wright Enterprises purchased royalty interests in several oil and gas leases owned by Southern Gas for $420,000. Later in 1986, Southern Gas sold a fifteen percent working interest in twenty gas wells to Wright Enterprises for $500,000. Finally, in October 1986, Wright Enterprises bought the Blackwater Natural Gas Corporation account receivable for *359 $200,000 from Southern Gas. These assets were referred to as the “Gas Interests.”[4]
On December 23, 1988, Leonard Nave and Rick Avare created the Southern Gas Holding Company, Inc. (“SG Holding”), to be the parent company of Southern Gas. Simultaneously with the formation of SG Holding, Wright Enterprises and SG Holding entered into a Stock Purchase Agreement and Limited Price Put Option (the “Stock Agreement”). In this agreement, Wright Enterprises expressed a desire to sell all of its stock in Southern Gas. According to the Stock Agreement, Wright Enterprises owned 1040 shares of Southern Gas stock at that time. There is some confusion as to how Wright Enterprises came to own this amount of stock in Southern Gas, but it appears that all parties agree that 440 of the shares ostensibly owned by Wright Enterprises in Southern Gas were actually shares of Wright Resources stock that Wright Enterprises owned.[5]
Pursuant to the Stock Agreement, SG Holding paid $700,000[6] and gave an $800,000 promissory note to Wright Enterprises and received 940 shares[7] of Southern Gas stock. According to the Stock Agreement, SG Holding could purchase the remaining 100 shares[8] at a set price (the “Put Option”) at a later date.[9] SG Holding defaulted on the $800,000 promissory note, however, and in April 1990, it *360 proposed a settlement of $200,000 with $85,000 cash down and a promise to pay $115,000 within 30 days.[10] Pursuant to this settlement, SG Holding would also receive the remaining 100 shares of Southern Gas stock that Wright Enterprises still owned. Wright Enterprises agreed to this settlement, and also agreed in the settlement that any and all interests that Wright Enterprises had in Southern Gas or its subsidiaries would be terminated thereby.[11] However, the 100 shares of Southern Gas stock were apparently not actually transferred to SG Holding.[12] SG Holding later defaulted on the $115,000 promissory note.
In 1994,[13] SG Holding offered to purchase the remaining 100 shares of Southern Gas and certain gas interests[14] that Wright Enterprises still owned in Southern Gas for $50,000 cash. At this point, Wright Enterprises had pledged the 100 shares of Southern Gas stock, as well as the gas interests, as collateral on a loan it had received from PNC Bank (formerly “Citizens Fidelity Bank”). Wright Enterprises, Southern Gas, SG Holding, and PNC Bank entered into agreements in which SG Holding paid PNC Bank $50,000 in cash (which would be applied to the outstanding balance due on a loan to Wright Enterprises from PNC Bank), Wright Enterprises assigned the 100 shares of Southern Gas stock and the gas interests to SG Holding, and PNC Bank consented to the transfers and terminated its liens and security interests on the property. Notably, however, the agreements lacked any clause stating that they terminated any and all interests Wright Enterprises might have in Southern Gas, or that the agreements superseded the settlement under which SG Holding still owed Wright Enterprises $115,000.

2. The AmSouth Judgment

In April 1990, Southern Gas and Alpha Gas Development of Texas, Inc. (“AG Texas”)[15] took out a loan from AmSouth Bank, N.A., in the amount of $2,056,675.72. Wright Enterprises, Wright Resources, Alpha Gas, and Calumet Farm, Inc., served as guarantors for this loan. Southern Gas and AG Texas later defaulted on the loan, and after the default AmSouth Bank initiated suits against Southern Gas, *361 AG Texas, and the guarantors, obtaining a judgment against them in 1992. Southern Gas and Wright Resources were released from the judgment in exchange for a $250,000 payment on January 18, 1995. Alpha Gas, AG Texas, Wright Enterprises, and Calumet Farms remained liable pursuant to the judgment. The bankruptcy court has reserved ruling on whether Wright Enterprises deserves to be indemnified by Southern Gas with respect to this issue.

S. The Asset Purchase Agreement between Southern Gas and American Resources

In October of 1993, Southern Gas and SG Holding entered into an Asset Purchase Agreement (the “Asset Agreement”) with American Resources of Delaware, Inc.[16] Pursuant to this agreement, American Resources purchased substantially all of the assets owned by Southern Gas in exchange for the assumption of certain liabilities, as well as shares of American Resources common stock. Specifically, American Resources acquired approximately $15 million of assets owned by Southern Gas, consisting primarily of oil and gas properties and support equipment, and in consideration issued to Southern Gas 5,717,981 shares of American Resources common stock, and assumed approximately $11 million of Southern Gas’s liabilities, consisting primarily of notes payable, accounts payable, and net deferred tax liability.[17] The transferred American Resources common stock was, at this time, worth somewhere between $3.2 and $3.7 million. In conjunction with the Asset Agreement, American Resources formed Southern Gas Company of Delaware (“SG Delaware”) as its wholly-owned subsidiary and assigned the assets and liabilities from the Asset Agreement to this new company. Both parties agree that the Asset Agreement and the transfer of the Southern Gas assets were supported by adequate consideration.[18] After the execution of the Asset Agreement, Leonard Nave; Rick Avare, Karen Underwood, and William F. Nave, II, became officers and directors of SG Delaware.
After the completion of the transactions outlined in the Asset Agreement, Southern Gas was liquidated and dissolved. During this liquidation, the net assets of Southern Gas were distributed to its shareholders. No notice of this distribution was given to Wright Enterprises, nor was any provision made for any potential indemnity claim that Wright Enterprises may have against Southern Gas.
J. The Proceedings Beknv
On June 6, 1995, an involuntary petition of bankruptcy was filed against Wright Enterprises in the United States Bankruptcy Court for the Eastern District of Kentucky. Wright Enterprises later withdrew its objections to the involuntary petition, and then agreed to a voluntary adju *362 dication of the bankruptcy on May 29, 1996. A Chapter 7 Trastee, Castil Williams, was appointed to administer the bankruptcy. The Trustee initiated this adversary action on April 30, 1998, alleging, among other things, (1) that Wright Enterprises was entitled to indemnification from Southern Gas and its subsidiaries for payments it had made on their behalf as guarantor of certain loans; (2) that Wright Enterprises was owed large sums of money by Southern Gas; and (3) that Southern Gas, through its officers and directors, conveyed certain assets with the intent to defraud Wright Enterprises, and that others of the defendants, including American Resources, SG Holding, and SG Delaware, were hable as successors to Southern Gas.
The bankruptcy court held a pre-trial conference on July 28,1998. In this conference, the bankruptcy court set February 28, 1999 as the date for the completion of discovery.[19] On October 29,1998, a second pre-trial conference was held to reevaluate the parties’ positions. The bankruptcy court held a third pre-trial conference on March 18, 1999, at which the Trustee requested an extension of the deadline for discovery. The defendants agreed to allow the Trustee to take the deposition of Leonard Nave in April 1999. During this deposition, Leonard Nave stated that many of the documents which the Trustee was requesting, including bank statements, tax returns, and other financial documents, had most likely been destroyed. After Leonard Nave’s deposition, the defendants all filed for summary judgment, and oral arguments were scheduled for May 17, 1999. Before the May 17, 1999, hearing, the Trustee requested an extension of time to complete discovery. The hearing was rescheduled for July 12, 1999, at which time the bankruptcy court granted the Trustee’s motion to extend discovery until October 20,1999. From the July 12,1999, hearing until September 22, 1999, the Trustee did not conduct any depositions or serve any additional discovery requests on the defendants. Then, on September 22, 1999, Castil Williams resigned as Trustee, without any explanation. At about the same time, American Resources made available to the Trustee a large number of documents[20] in response to the discovery requests made by the Trustee six months previously. On October 5, 1999, several other documents—including the Stock Agreement, the 1990 amendment to the Stock Agreement, the 1994 Assignment between SG Holding and PNC Bank, bank statements, and other financial records which the Trustee believed had been destroyed based on Leonard Nave’s deposition—were filed as part of the record by SG Holding. Finally, on November 19, 1999, the 1994 Purchase Agreement and Assignment of Partial Interest—which the Trustee also believed had been destroyed—was filed as part of the record.
James D. Lyon entered his appearance as the successor Trustee on October 19, 1999. The new Trustee took one deposition, requested two others, and reviewed a number of documents at the offices of American Resources. On October 20, 1999, the new Trustee requested an extension of discovery until January 30, 2000. The defendants then repeated their request for summary judgment, and after oral arguments, the bankruptcy court denied the Trustee’s motion for an extension of discovery and granted defendants’ motions for summary judgment in part.
*363 On November 24, 1999, the bankruptcy court, after reviewing the submissions of both parties, held that all of Wright Enterprises’s claims based on the 1980s loans to Southern Gas had been settled by the Stock Agreement, the 1990 amendment to the Stock Agreement, and the 1994 agreements between Wright Enterprises, Southern Gas, SG Holding, and PNC Bank. In a separate opinion filed on the same day, the bankruptcy court ruled that American Resources and SG Delaware were not subject to successor liability for the debts of Southern Gas, reasoning: (1) that there was no evidence of fraud with respect to the asset purchase agreement; (2) that American Resources and SG Delaware had not expressly or by implication agreed to assume the indebtedness of Southern Gas to Wright Enterprises; (3) that the 1994 asset purchase transaction did not amount to a de facto merger between Southern Gas and SG Delaware; and (4) that SG Delaware was not merely a continuation of Southern Gas.
On appeal, the district court affirmed the judgment of the bankruptcy court, finding that all claims Wright Enterprises might have based on the 1980s loans had been settled as the bankruptcy court had determined. The district court also found, like the bankruptcy court, that American Resources and SG Delaware were not subject to successor liability, holding that Kentucky law forbids successor liability where, as here, the parties have engaged in a good faith transaction supported by adequate consideration. Finally, the district court determined that the bankruptcy court did not abuse its discretion in denying the Trustee an extension of discovery.
ANALYSIS

A The Standard of Review

The Court reviews an appeal that originated in a bankruptcy court “differently than a typical appeal from the district court. The bankruptcy court makes initial findings of fact and conclusions of law. The district court then reviews the bankruptcy court’s findings of fact for clear error and the bankruptcy court’s conclusions of law de novo. We in turn review the bankruptcy court’s findings of fact for clear error and the district court’s conclusions of law de novo.” Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 106 F.3d 1255, 1259 (6th Cir.1997) (internal citations omitted).
The present case, as an appeal of the bankruptcy court’s grant of summary judgment, does not involve “findings of fact” that are reviewed under a clearly erroneous standard. See, e.g., Silverstein v. United States, 419 F.2d 999, 1001 n. 3 (7th Cir.1969) (“The government’s brief argues—in support of the district court’s reasoning with respect to the nature of the transaction-in terms of ‘findings,’ and seeks application by us of the ‘clearly erroneous’ rule to these ‘findings.’ Since the judgment was summary, the ‘clearly erroneous’ rule is inapplicable. We take the alleged ‘findings’ to be subordinate conclusions of law.”); see also Lemelson v. TRW, Inc., 760 F.2d 1254, 1260 (Fed.Cir.1985) (“In the appeal of a grant of summary judgment, such factual inferences as are material to the grant are not reviewed under the clearly erroneous standard, as if they were findings of fact made following a trial of issues.”). Rather, a court of appeals reviews a decision to grant summary judgment de novo. Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 521 (6th Cir. 1997). Summary judgment is only appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.” *364 Fed.R.Civ.P. 56(c). Generally, the burden is on the moving party to show that no genuine issue of material fact exists. Gregg v. Allem-Bradley Co., 801 F.2d 859, 861 (6th Cir.1986). However, the moving party does not necessarily have to produce evidence showing the absence of a genuine issue of material fact. Instead, “the burden on the moving party may be discharged by ‘showing’—that is, pointing out to the [ ] court—that there is an absence of evidence to support the nonmoving party’s case.” Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In summary judgment the facts as well as any inferences that can be drawn from them must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
Finally, discovery matters are reviewed under an abuse of discretion standard. See Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1276 (6th Cir.1998). “Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.” Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989). However, we review de novo the district court’s determination whether the bankruptcy court abused its discretion in denying the Trustee an extension of discovery. See Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir.2000).

B. Summary Judgment Was Not Appropriate Based on the Alleged Final Settlement of Debts of Southern Gas and SG Holding to Wright Enterprises

Summary judgment for defendants Southern Gas, SG Holding, Alpha Gas, William F. Nave, II, and Wil F. Kowalke, was inappropriate because, viewing the evidence in the light most favorable to the Trustee, questions of fact still remained as to whether the defendants’ obligations to Wright Enterprises had been fully settled. In support of his contention that the defendants were not entitled to summary judgment as a matter of law, the Trustee makes two arguments. First, he states that the bankruptcy court, and the district court in affirming the bankruptcy court’s decision, relied on evidence that was not properly in the record because it had not been authenticated. Second, he asserts that both the bankruptcy court and the district court overlooked disputed facts in the record with respect to whether the later settlements and agreements actually discharged all of Southern Gas’s debts to Wright Enterprises from the loans it received during the 1980s. We do not consider the first argument because it was not raised below, but the second argument has merit.
With regard to the first argument, the Trustee did not argue to the bankruptcy court or to the district court that some of the evidence that they relied upon in coming to their decisions was not properly before the court for lack of authentication. It has long been a rule of this Court not to consider arguments and issues that were not raised in the courts below. See Doll v. Glenn, 231 F.2d 186, 190 (6th Cir.1956); see also Helvering v. Wood, 309 U.S. 344, 348-49, 60 S.Ct. 551, 84 L.Ed. 796 (1940). Any argument that Trustee may have had with respect to the lack of authentication of these documents was waived by his failure to assert the argument to the bankruptcy and district courts, and we need not address it here.
The Trustee’s second argument, however, has merit. The district court found that there was sufficient evidence in the record to support the bankruptcy court’s conclusion that all claims that Wright Enterprises had against Southern Gas had been settled by the 1990 and 1994 agree *365 ments. Specifically, the district court found that the parties settled the $800,000 debt from the Stock Agreement in the 1990 agreement for $200,000: $85,000 in cash and a $115,000 promissory note. The district court also found that there was sufficient evidence in the record for the bankruptcy court to conclude that the parties settled the $115,000 debt in the 1994 agreement for $50,000 in cash.
The Trustee asserts that the bankruptcy and district courts erred in these conclusions for two reasons. First, he contends that there is a genuine issue of material fact as to whether the 1990 agreement was truly intended to discharge Southern Gas’s debt to Wright Enterprises. The district court relied on Wright Enterprises’s financial statements, which showed a $800,000 note receivable from Southern Gas on September 30,1989, but did not show this note receivable on the January 31, 1990 financial statements. The Trustee points out that an April 24, 1990, memorandum from Lyle Robey, CEO of Wright Enterprises, to the Wright Family[21] shows that Southern Gas still owed Wright Enterprises over $750,000, and argues that this controverts the lower court’s contention that the 1990 agreement settled Southern Gas’s debts to Wright Enterprises.
While the Trustee’s argument may cast into some doubt the lower court’s conclusion about the financial statements, it does not overcome the other evidence that shows that the 1990 agreement was intended to discharge Southern Gas’s indebtedness to Wright Enterprises. The April 24, 1990, memorandum that the Trustee asserts in his favor itself attests that the parties intended for the 1990 agreement to discharge all indebtedness between the two companies. See Ex. 56, J.A. at 806 (“The net result is that we pick up $200,000.00 in cash, which we desperately need, and our indebtedness will be either forgiven or indemnified by [Southern Gas], plus we will be out of business with Southern Gas in the future. ”) (emphasis added). Even more convincing, however, is the 1990 agreement itself, which was not signed by the parties until July of 1990. The agreement states that in exchange for $200,000, Wright Enterprises would release Southern Gas from any claims and liabilities Wright Enterprises might have against Southern Gas from the Stock Agreement. The 1990 Agreement further stated that it terminated any and all interest that Wright Enterprises had in Southern Gas. Lyle Robey’s statements in the April 24 memorandum are therefore completely consistent with the 1990 agreement itself, and do not raise a genuine issue of material fact that requires reversal of the lower courts’ grant of summary judgment.[22]
Second, the Trustee contends that there is a genuine issue of material fact as to whether the 1994 agreement was a settlement of the $115,000 obligation that Southern Gas had defaulted on under the 1990 agreement.[23] The district court found that the $50,000 payment pursuant to the 1994 agreement was a settlement of the $115,000 obligation under the 1990 agree *366 ment. The Trustee correctly points out that the Purchase Agreement and Assignment of Partial Interest between Wright Enterprises, Southern Gas, and PNC Bank does not contain any reference to the 1990 agreement or the 1980s debt, and only purports to transfer to Southern Gas the remaining 100 shares and certain gas interests.[24]
The Purchase Agreement and Assignment of Partial Interest as well as the Assignment between SG Holding and PNC Bank, however, both show that Wright Enterprises gave up the rights assigned to it by Southern Gas in an “Assignment of Partial Interest” dated July 10,1986. J.A. at 389, 510. The July 10, 1986, “Assignment of Partial Interest” apparently pertained only to the gas interests, and it is unlikely that it can be interpreted to encompass the $115,000 obligation that arose in 1990. In any event, the 1986 assignment was not included in the record.
There is therefore no basis in the record upon which the bankruptcy and district courts could have concluded that all Wright Enterprises’s obligations from Southern Gas were settled through the 1994 transactions. Without further evidence, and considering that on a motion for summary judgment the evidence must be viewed in the light most favorable to the non-moving party, see Matsushita, 475 U.S. at 587, we conclude that a genuine issue of fact still exists as to whether the 1994 agreement fully discharged Southern Gas of any obligation it may have had to Wright Enterprises.
Therefore, we reverse the judgment of the bankruptcy and district courts granting summary judgment to the extent that it relies upon the discharge of Southern Gas’s or SG Holding’s debts to Wright Enterprises under the 1994 agreement. A genuine issue of fact still remains with regard to that issue.

C. Defendants American Resources and SG Delaware Were Not Entitled to Summary Judgment Because a Question of Fact Still Remained With Respect to the Potential Successor Liability of American Resources and SG Delaware for the Obligations of Southern Gas.

Summary judgment for defendants American Resources and SG Delaware was inappropriate because, viewing the evidence in the light most favorable to the Trustee, a question of fact still remained as to whether American Resources and SG Delaware were hable as successors to Southern Gas. The Trustee argues that there is a genuine issue of material fact with regard to whether American Resources and SG Delaware are hable as successors to Southern Gas, because he contends that the Asset Agreement constituted a de facto merger, or, in the alternative, that American Resources and SG Delaware were merely a continuation of Southern Gas.
Generally, under Kentucky law, “ ‘a purchaser, in the absence of a contract obligation, cannot be held for the debts and liabilities of the selling corporation.’ ” Conn v. Fates Div. of Mathewson Corp., 835 F.2d 145, 146 (6th Cir.1987) (citing American Railway Express Co. v. Commonwealth, 190 Ky. 636, 228 S.W. 433, 441 (1920)). Kentucky recognizes four exceptions to this rule, which are
(1) where the purchaser expressly or impliedly agrees to assume such debts or other liabilities; (2) where the transaction amounts to a consolidation or merger of the seller and purchaser; (3) *367 where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts.
Id. The Trustee argues that American Resources and SG Delaware have successor liability in this case because their transactions and relationship with Southern Gas fit under both exceptions two and three given in Conn.
The bankruptcy court concluded that the Trustee had not introduced any probative evidence that supported the existence of any of the circumstances in which successor liability might attach. After reviewing the Asset Agreement, the bankruptcy court found, as a matter of law, that the Asset Agreement was an asset purchase agreement and not a merger or consolidation agreement. The bankruptcy court also analyzed the relationship between Southern Gas and SG Delaware and concluded that although SG Delaware engaged in substantially similar business to that of Southern Gas, the Trustee failed to identify any probative evidence that would distinguish the Asset Agreement from any other asset purchase transaction in which the purchaser continues in the same business as its seller. Since the Trustee agreed that the Asset Agreement was supported by adequate consideration and there was no evidence of fraud, the bankruptcy court held that the transaction was bona fide and neither American Resources nor SG Delaware were subject to successor liability.
On appeal, the district court held that Kentucky law forbids successor liability, in the absence of contractual obligation or a finding of fraud, where the parties have engaged in a good faith transaction that was supported by adequate consideration. In coming to this conclusion, the district court relied on American Railway Express Co., 228 S.W. at 436-37, the critical passage of which states:
Questions concerning the responsibility of the purchasing corporation for the debts and liabilities of the selling corporation have come before the courts of the country in many cases, and it is held practically without dissent that, although the purchasing corporation does not assume the payment of any of the debts or liabilities of the selling corporation, it will yet be made responsible for them if there was no consideration for the sale, or if it was not in good faith, but for the purpose of defeating the creditors of the selling corporation or where there has been a merger or consolidation of the corporations, or where the purchasing corporation took over from the stockholders all of the stock of the selling corporation, or where the transaction amounts to a mere reincorporation or reorganization of the selling corporation. It is also generally agreed that when these conditions exist the purchasing corporation will be responsible for all the debts and liabilities of the selling corporations, without reference to whether these debts or liabilities were created by contract or arose out of tort, or were liquidated or unliquidated.
It is equally well settled that when the sale is a bona fide transaction, and the selling corporation receives money to pay its debts, or property that may be subjected to the payment of its debts and liabilities, equal to the fair value of the property conveyed by it, the purchasing corporation will not, in the absence of a contract obligation or actual fraud of some substantial character, be held responsible for the debts or liabilities of the selling corporation.
Id. The first paragraph of this passage lays out the exceptions to the general rule of non-liability for purchasers, and it is on *368 this paragraph that the Court in Conn relied in outlining the four principal exceptions. See 835 F.2d at 146. The second paragraph, however, is the one that the district court relied on in holding that American Resources and SG Delaware did not have successor liability to Southern Gas.
The relationship between the first and second paragraphs in the passage from American Railway Express Co. is not clear. The district court appears to interpret the rule stated in the second paragraph as superseding any of the exceptions listed in the first paragraph; i.e., if the transaction was in good faith and for adequate consideration, then it does not matter if the transaction fits into one of the exceptions in the first paragraph.[25] The second paragraph appears to include two of the four exceptions to the general rule, in that it doesn’t apply if there is fraud or a contractual obligation. Its relationship to the other two exceptions, however—de facto merger or mere continuation—is more ambiguous. It could be argued that the American Railway Express Co. court meant that these two situations would not constitute “bona fide” transactions. The passage is difficult, but it makes the most sense when the second paragraph is not thought of as a superseding or “trumping” rule, but is instead understood as a restatement of the rule including—although ambiguously—the exceptions outlined in the first paragraph.
This interpretation of the passage from American Railway Express Co. is supported by the understanding of the passage by the Court of Appeals of Kentucky[26] in Payne-Baber Coal Co. v. Butler, 276 Ky. 211, 123 S.W.2d 273, 275 (1938). In Payne-Baber Coal Co., the court upheld the decision of the lower court, which held that despite some evidence showing that the transaction between the purchasing and selling corporations was in good faith and for adequate consideration, there was still such continuity between the two corporations as to conclude that the purchasing corporation was a mere continuation of the selling corporation and that the transaction was not bona fide. Id. In upholding the lower court, the Payne-Baber Coal Co. court cited the same passage given above from American Railway Express Co. Id. This holding is consistent with our reading that even where the transaction appears to be in good faith and for adequate consideration, a purchasing corporation can still have successor liability if the purchaser is in actuality a mere continuation of the selling corporation. The logic of Payne-Baber Coal Co. with respect to a “mere continuation” would apply equally to a de facto merger; a purchasing corporation can therefore also have successor liability if the transaction constituted a de facto merger.[27]
In order to avoid summary judgment, the Trustee still must identify some probative evidence that the circumstances amounting to either a “mere continuation” or de facto merger occurred in this case. *369 The factors for determining whether a transaction amounts to a de facto merger were set forth in Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451 (11th Cir. 1985), as (1) “continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations;” (2) “continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;” (3) “[t]he seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;” and (4) “[t]he purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.” Id. at 1457-58 (quoting Keller v. Clark Equipment Co., 715 F.2d 1280, 1291 (8th Cir. 1983)). Similar to the first two prongs of the de facto merger test, in order to fit into the mere continuation exception, the Trustee must show that there is “ ‘a common identity of the officers, directors and stockholders in the selling and purchasing corporations.’ ” Id. at 1459 (quoting Leannais v. Cincinnati Inc., 565 F.2d 437, 440 (7th Cir.1977)).
The Trustee contends that all these factors are present in this case. First, he argues that there is a continuity of operating assets between Southern Gas and American Resources/SG Delaware. As evidence of this, Trustee points to American Resources/SG Delaware’s purchasing substantially all of Southern Gas’s assets, and asserts that these assets constituted the majority of American Resources/SG Delaware’s operating assets. American Resources stated in its 1993 Form 10-K that it owns 316 oil and gas wells, 274 of which are in Kentucky, and the Trustee contends that the majority of the 274 wells were acquired from Southern Gas. Trustee furthermore asserts that American Resources and SG Delaware were almost exclusively made up of Southern Gas assets from a financial viewpoint, and points to two financial statements of American Resources, the first of which shows that American Resources’s total revenues for 1993 were $357,611, while the second, a pro-forma restatement of American Resources financials after the Asset Agreement, shows that net sales for 1993 were $9,565,000. This evidence, the Trustee asserts, shows that American Resources and SG Delaware were made up almost exclusively of the assets of Southern Gas.
Second, the Trustee contends that there is continuity of business, goodwill, contacts, and physical location, pointing to the similarity of the names of Southern Gas and SG Delaware, as well as the maintenance of the same principal place of business at 160 Morgan Street, Versailles, Kentucky. Third, the Trustee contends that there is continuity of employees, evidenced by the fact that all the employees of Southern Gas retain the same jobs, fulfill the same duties, work in the same location, produce the same product, and market it under the same logo.
Fourth, the Trustee asserts that there is continuity of management. Leonard K. Nave served as president of Southern Gas from its inception until its dissolution in 1994, Rick Avare served as the treasurer, and Karen Underwood served as both secretary and vice president. Leonard Nave and Rick Avare also served for a period of one month on the Board of Directors of American Resources in order to assist that company through the transition associated with the Asset Agreement. Following the completion of the Asset Agreement, Leon *370 ard Nave and Rick Avare became officers of SG Holding and “significant employees” of American Resources in February 1994. They both became directors of American Resources in September 1994, and Avare became Chief Operating Officer and Executive Vice President of American Resources in August 1995. Underwood also became an officer of American Resources.
Fifth, the Trustee contends that there is a continuity of ownership. American Resources, in their 1998 Form 10-K, stated that SG Holding, previous to the Asset Agreement, owned or controlled an 81% interest in Southern Gas, and that Leonard Nave and Rick Avare were the principal shareholders of SG Holding and Southern Gas. Pursuant to the Asset Agreement, American Resources transferred 49% of its issued and outstanding common stock to Southern Gas and SG Holding. This stock was then distributed to the shareholders of Southern Gas and SG Holding upon the dissolution of those companies.
The Trustee alleges that the facts listed above satisfy the first two prongs of the de facto merger test set forth in Bud Antle, as well as the mere continuation test described in Leannais. As for the final two factors of the de facto merger test, the Trustee directs the Court’s attention to the liquidation and dissolution of Southern Gas in 1994, and the assumption of certain liabilities by American Resources in the Asset Agreement. He alleges that these facts satisfy both of the final two prongs of the de facto merger test.
Viewing this evidence in the light most favorable to the Trustee, the Trustee has introduced sufficient evidence to make summary judgment inappropriate. At this stage, we do not hold as a matter of law that SG Delaware is a continuation of Southern Gas: defendants may be able to provide evidence to refute such a conclusion. We conclude only that summary judgment for defendants was not appropriate given the facts thus far reflected in the record. We therefore reverse the judgment of the bankruptcy and district courts and remand for further consideration, consistent with this opinion, of whether the circumstances of the Asset Agreement met the de facto merger test described in Bud Antle, or the mere continuation test set forth in Leannais.

D. The Trustee’s Motion for an Extension of Discovery

Given our conclusion that summary judgment was not appropriate, we need not decide whether the bankruptcy court abused its discretion by denying the Trustee’s motion for an extension of discovery. The Trustee argues that justice and a sense of fair play required an extension of the discovery deadline in light of the following factors: the defendants’ failure to produce documents in a timely manner, the resignation of the old Trustee and the appointment of the new Trustee shortly before the discovery deadline, the enormous volume of documents received by the Trustee from American Resources a month before the discovery deadline (including the Stock Agreement, the 1990 amendment to the Stock Agreement, the 1994 Assignment between SG Holding and PNC Bank, bank statements, and other financial records which the defendants had previously led the Trustee to believe had been destroyed), and the lower courts’ reliance on the 1994 Purchase Agreement and Assignment of Partial Interest (which was submitted after the discovery deadline).
The defendants argue in response that the bankruptcy court had already granted the Trustee numerous extensions of discovery totaling to 1.5 years, that the Trustee had failed to undertake any discovery for long periods of time previously (al *371 though this was under a different Trustee), that the Trustee already had the pertinent documents in his possession (albeit from a source other than the defendants), and that the Trustee never showed what further discovery would prove.
Considering the large volume of documents that the defendants produced only a month before the discovery deadline after having previously led the Trustee to believe that these documents had been destroyed, it appears to us that the bankruptcy court perhaps should have allowed the new Trustee an extension of discovery. But we need not so decide. Defendants objected to the discovery extension “[s]inee the documents filed in the Record clearly showed that Wright Enterprises had settled its claims against Southern Gas and no amount of additional discovery would assist the new Trustee.... ” S. Gas Br. at 14. In light of our holding to the contrary, this basis for the bankruptcy court’s denial of further discovery no longer obtains. On remand, the bankruptcy court may exercise its discretion in deciding whether to permit additional discovery.
CONCLUSION
For the foregoing reasons, we REVERSE the district court’s order affirming the bankruptcy court’s decision and REMAND for further proceedings consistent with this opinion.

. William F. Nave, II, a defendant in this appeal, is the son of Leonard K. Nave.

. These shares were apparently later pledged to PNC Bank (formerly known as "Citizens Fidelity Bank”) as a security interest.

. There is some disparity between the figures given by the Trustee and the defendants as to the amount of these loans. The actual amount owed, however, is not important in this controversy, as the question at issue is whether later payments made by Southern Gas to Wright Enterprises were intended to satisfy all debts between the parties.

. It is possible that other assets were also included in the "Gas Interests.”

. The Trustee and the district court both describe the 440 shares as actually being Wright Enterprises’s stock in Wright Resources, and imply that the Stock Agreement suffered from poor draftsmanship. Defendant Southern Gas glosses over this point, asserting that the 440 shares were those owned by Wright Enterprises as an initial incorporator and investor in Southern Gas in 1983.
There is also some debate as to the total amount of stock owned by Wright Enterprises at the time of the Stock Agreement. The Trustee asserts, and the district court agreed, that Wright Enterprises owned 1040 shares of stock in Southern Gas. On the other hand, defendant Southern Gas alleges, and the bankruptcy court agreed, that Wright Enterprises only owned 940 shares of stock in Southern Gas. This discrepancy appears to be due to the 100 shares of stock that Wright Enterprises ostensibly bought from Al Keyser, Jr.; the Trustee and the district court take this 100 shares into account, while defendant Southern Gas and the bankruptcy court do not. However, as previously stated, Wright Enterprises owned 1040 shares of Southern Gas stock according to Paragraph 6.1 of the Stock Agreement.
The Trustee and the district court also concur that, under the Stock Agreement, Wright Enterprises agreed to sell all but 100 of its shares in Southern Gas to SG Holding for $1.5 million, $750,000 of which was to be paid in cash, and the other $750,000 was in the form of a promissory note. The bankruptcy court and defendant Southern Gas, however, assert that, under the Stock Agreement, Wright Enterprises agreed to sell all of its 940 shares in Southern Gas for $1.5 million.

. This payment was supposed to be $750,000 under the Stock Agreement, but apparently SG Holding was unable to pay that much in cash. According to the bankruptcy court, the terms of the Stock Agreement were altered in that Wright Enterprises accepted $700,000 in cash and an $800,000 promissory note, instead of $750,000 in cash and a $750,000 promissory note. The $800,000 note is not part of the record, although it is undisputed that Wright Enterprises’ 1989 financial statements show an account receivable of $800,000 from the "Southern Sale.”

. According to defendant Southern Gas and the bankruptcy court, SG Holding received 840 shares of Southern Gas stock.

. These shares were pledged to PNC Bank (formerly “Citizens Fidelity Bank”) as a security interest (collateral) for a loan made to Wright Enterprises.

. According to defendant Southern Gas and the bankruptcy court, SG Holding would instead receive the remaining 100 shares when it paid the $800,000 promissory note.

. Wright Enterprises was apparently amenable to this settlement due to its own financial difficulties, as well as the tenuous financial situation of Southern Gas. Apparently there was also some litigation aimed at both Southern Gas and Wright Enterprises as its surety, and Wright Enterprises would be able to remove itself from liability by this settlement. See J.A. at 804-6.

. Defendant Southern Gas asserts that after this settlement (and apparently after the later agreement between Wright Enterprises, SG Holding, and PNC Bank), SG Holding and Southern Gas no longer owed anything to Wright Enterprises. As evidence, defendant Southern Gas points to Wright Enterprises’ financial statements, which in 1989 showed an account receivable of $800,000 from the "Southern Sale,” while in 1990 they showed no account receivable from Southern Gas, SG Holding, or the “Southern Sale.”

. Defendant Southern Gas and the bankruptcy court state that Wright Enterprises was unable to transfer the remaining 100 shares because the shares had been pledged to PNC Bank as a security interest.

. The agreement between Wright Enterprises, Southern Gas, and PNC Bank is dated December 1993, while the agreement between PNC Bank and SG Holding is dated January 4, 1994.

. These gas interests include, but may not be limited to, the "Gas Interests” discussed supra.

. This is not the same company as Alpha Gas; Alpha Gas was a Kentucky corporation, while AG Texas was a Texas corporation.

. This company is now known as “American Resources Offshore, Inc.”

. There is some discrepancy between the Trustee’s figures and those of defendant American Resources with regard to the Asset Agreement. The Trustee’s figures, which are used above, appear to have been taken from American Resources’s Form 10-K filed with the Securities and Exchange Commission (“SEC”) for the 1993 fiscal year. American Resources’s figures appear to be taken from its 1995 Animal Report, and state that American Resources acquired approximately $16.8 million in Southern Gas’s assets, assumed approximately $13.6 million in liabilities, and issued 1,429,495 shares of common stock. These differences in the figures do not materially affect the outcome of the case.

. However, the Trustee now wishes to withdraw any such stipulation he made on this issue.

. The defendants requested a short period for discovery, as American Resources was a publicly-traded company and was required to list this litigation on its financial statements.

. The Trustee claims that American Resources made available approximately 7,000 documents.

. Members of the Wright Family were the owners of Wright Enterprises.

. The fact that the January 31, 1990 financial statements did not include the $800,000 note receivable is insufficient to prove that this debt was settled, considering that the settlement agreement was not signed until July of 1990. Nevertheless, this does not create a genuine issue of material fact, given that the July 1990 agreement-which post-dated the Robey memorandum-unequivocally stated that it was intended to satisfy the $800,000 debt.

. Defendants concede that Southern Gas defaulted on its $115,000 obligation to Wright Enterprises. S. Gas Br. at 19.

. These gas interests include the "Gas Interests” discussed supra, although it is unclear whether other gas interests besides those described previously are also included.

. The district court does say that the transaction will only be upheld in the absence of contractual obligation or fraud, which are two of the four exceptions.

. The Court of Appeals of Kentucky was at that time the name of the highest court in the Commonwealth of Kentucky.

. As will become clear later in this opinion, the mere continuation and de facto merger exceptions are substantially similar. In fact, some courts have intimated that mere continuation is actually subsumed in the de facto merger exception. See Fiber-Lite Corp. v. Molded Acoustical Products of Easton, Inc., 186 B.R. 603, 609 (E.D.Pa.1994).